**Albert E. KUEHNERT**

v.

**TEXSTAR CORPORATION et al.**

**Civ. A. No. 66–H–396.**

United States District Court
S. D. Texas,
Houston Division.

Feb. 27, 1968.

Seymour Lieberman, and Herbert Finkelstein, Houston, Tex., for plaintiff.

John C. Snodgrass, of Vinson, Elkins, Weems & Searls, Houston, Tex., J. Burleson Smith, of Cox, Smith & Smith, San Antonio, Tex., for defendants.

## MEMORANDUM & ORDER

SINGLETON, District Judge.

This is an action for damages based upon an alleged violation of the Securities Exchange Act of 1934 (15 U.S.C.A. § 78j(b)) (the Act) and Rule 10b–5 (Title 17 § 240.10b–5 C.F.R.) which was formulated by the Securities and Exchange Commission pursuant to such Act.

Plaintiff Albert E. Kuehnert alleges that he purchased common stock of Texstar Corporation because of confidential information given him by the then president of Texstar, William T. Rhame. This information later turned out to be false and plaintiff was forced to sell his stock at a loss. Kuehnert is suing Rhame, Texstar Corporation, and B. I. King, the present president of Texstar, for the giving of false information.

A motion for summary judgment on behalf of defendants Rhame, Texstar, and King is now before this Court. Defendant B. I. King took over as president after Rhame resigned, and at the oral hearing on defendants' motion for summary judgment plaintiff agreed that the motion for summary judgment should be granted as to defendant King.

Some time before January of 1965, plaintiff Albert E. Kuehnert became acquainted with defendant William T. Rhame (who was president of Texstar) due to some business transactions pending between Kuehnert and Texstar Corporation. According to deposition testimony this relationship became a personal one after a relatively short period of time.

In January of 1965 Rhame stayed a few days as a house guest of Kuehnert's. At this time Rhame gave Kuehnert confidential information concerning Texstar Corporation which led Kuehnert to purchase Texstar stock. (Dep. p. 35.) Rhame represented to Kuehnert that Texstar was in the process of acquiring an oil company (Coronet Oil Corporation). Also, that Texstar had made a deal with Texaco and Humble to drill two wells on farmouts on land that belonged to that oil company. Finally, that Texstar's earnings for the fiscal year ending March 31, 1965 would be $3.00 a share. (In January, 1965, the stock was selling for around 4¼.) (Dep. pp. 35–43.)

Relying on this confidential corporate information, Kuehnert began purchasing Texstar's stock on the open market through various brokers. It is undisputed that such purchases were through a facility of the national securities exchange. By the end of January he had purchased 4,000 shares (Dep. p. 47.), and by the end of March he had purchased around 40,000 shares. (Dep. p. 50.)

In April of 1965 there was a Texstar's stockholders' meeting. The stockholders voted in favor of the acquisition of Coronet Petroleum Corporation. Kuehnert learned then that the earnings of Texstar were not $3.00 a share for the fiscal year ending March 31, 1965. Also, there was no mention in the proxy material of any farmouts to Humble and Texaco on lands they were acquiring from Coronet. This information or lack of it led Kuehnert to believe he had information which the other stockholders did not have, and with reference to the earnings he accepted Rhame's explanations as to why they were not $3.00 a share. (Dep. pp. 72, 79.)

After the stockholders' meeting, Kuehnert continued to buy Texstar stock and he financed the purchases by buying on margin and borrowing money against the shares at a number of banks, and by the end of May, 1965, Kuehnert had purchased a total of 94,600 shares. During this period of time, Rhame was giving Kuehnert periodic reports on the progress of the wells. They had regular conversations concerning the depth the Texaco well had reached, and these reports continued right into May of 1965. Shortly thereafter, Rhame resigned as president of Texstar.

In the latter part of June, 1965, Kuehnert had written a check for Texstar stock which was returned because of insufficient funds and the brokerage firm sold him out. Because he had overextended himself, Kuehnert was unable to

continue purchaseing Texstar. The result was the price declined and the various businesses who had loaned him money sold the Texstar stock he had pledged to them. These sales caused the price to further decline and in the end Kuehnert was completely sold out.

Kuehnert seeks as damages the difference between what he paid for his Texstar shares and the price for which they were sold.

The applicable provisions of the Act are as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securites exchange—

* * * * * *

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5 as promulgated by the Securities and Exchange Commission reads as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

"in connection with the purchase or sale of any security."

The act confers upon the District Courts of the United States exclusive jurisdiction for violations of the Act or of the rules and regulations promulgated thereunder and of "all suits in equity and actions at law brought to enforce any liability or duty created by" the Act or the rules and regulations thereunder.

The preamble of the Act states that " * * * transactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are affected with a national public interest which makes it necessary to provide for regulation and control of such transactions and of practices and matters related thereto, including transactions by officers, directors, and principal security holders * * * and to insure the maintenance of fair and honest markets in such transactions."

■ There can be civil liability for damages when there is a violation of section 78j(b) and Rule 10b–5. See Brennan v. Midwestern United Life Insurance Co., 259 F.Supp. 673 (N.D.Ind. 1966) and the cases cited and discussed therein.

Kuehnert's cause of action against Rhame is bottomed on Rhame's alleged violation of Rule 10b–5 and his cause of action against Texstar is bottomed on Kuehnert's allegations that at the time Rhame was acting in the course and scope of his employment by Texstar.

Defendants, on the other hand, contend that, because of the circumstances surrounding Kuehnert's acquisition of his stock, he cannot employ the applicable provisions of the Act and Rule 10b–5 as a foundation to sustain the cause of action he attempts to assert here. This Court is inclined to agree.

■ There is no doubt but that Rhame is a corporate insider and as such subject to the provisions of the Act. A few reported cases concern 10b–5 and its application to corporate insiders. These cases support the position that trading by insiders based on material, undis-

closed information is a violation of 10b–5. See Kardon v. National Gypsum Co., 73 F.Supp. 798 (E.D.Pa.1947); Speed v. Transamerica Corp., 99 F.Supp. 808 at p. 829 (D.Del.1951); Securities and Exchange Commission v. Texas Gulf Sulphur Co., 258 F.Supp. 262 (S.D.N.Y. 1966).

In Cochran v. Channing Corp., 211 F.Supp. 239 (S.D.N.Y.1962) the court said:

"The Securities Exchange Act was enacted in part to afford protection to the ordinary purchaser or seller of securities. Fraud may be accomplished by false statements, a failure to correct a misleading impression left by statements already made or, as in the instant case, by not stating anything at all when there is a duty to come forward and speak. It is the use of the inside information that gives rise to a violation of Rule 10b–5." (At p. 243)

The above cases hold that the class of persons covered by the term "insider" included officers, directors, and *major stockholders*. According to Professor Alan R. Bromberg,

"Insiders have been held to include (1) officer-directors (2) responsible employees who were also substantial stockholders (3) the president's brother and close friends who had lent money to the issuer, were fully informed about its business, and had made other investments with the officer-directors. All three groups were liable as insider purchasers. The third group was alternatively liable as 'tippees' or aiders and abettors." See Bromberg, Securities Laws-Fraud-SEC Rule 10b–5 section 4.4, at 76 n. 33.1 (1967).

The Securities and Exchange Commission has also determined the class of people that fall into the category of insiders. In Re Cady Roberts & Co., 40 S.E.C. 907 (1961) involved an administrative proceeding to determine whether a broker should be suspended from the New York Stock Exchange. The defendant broker was held to have violated section 78j(b) and Rule 10b–5 for selling securities after learning nonpublic information relating to dividend action from an associate in his brokerage firm. The associate was a member of the board of directors of the company whose stock the defendant broker sold. In finding a violation, the Commission enunciated the following test to determine persons who may not use nonpublic corporate information for their own benefit:

"We have already noted that the anti-fraud provisions are phrased in terms of 'any person' and that a special obligation has been traditionally required of corporate insiders, e. g., officers, directors and controlling stockholders. These three groups, however, do not exhaust the classes of persons upon whom there is such an obligation. Analytically, the obligation rests on two principal elements; first, the existence of a relationship giving access, directly or indirectly, to information intended to be available only for a corporate purpose and not for the personal benefit of anyone, and, second, the inherent unfairness involved where a party takes advantage of such information knowing it is unavailable to those with whom he is dealing. In considering these elements under the broad language of the anti-fraud provisions we are not to be circumscribed by fine distinctions and rigid classifications. Thus, our task here is to identify those persons who are in a special relationship with a company and privy to its internal affairs, and thereby suffer correlative duties in trading in its securities. Intimacy demands restraint lest the uninformed be exploited."

Two courts have taken the above test and enlarged the class of people who are covered by Rule 10b–5. In Securities and Exchange Commission v. Texas Gulf Sulphur Co., 258 F.Supp. 262 (S.D.N.Y. 1966), the court included "employees as well as officers, directors, and controlling stockholders who are in possession of material undisclosed information obtained in the course of their employment." In Ross v. Licht, 263 F.Supp.

395 (S.D.N.Y.1967), the court was confronted with a situation where close friends of officers of a corporation had purchased stock from third parties knowing that the stock would be offered later at a public sale at a much higher price than they were paying these third parties. The court designated these friends "tippees" and held them liable under Rule 10b–5. The court said "tippees" were persons given information by insiders in breach of trust.

Kuehnert asserts that in the *Ross* case there was a concert of action between the officers of the corporation and their friends which is lacking here. This may be true, but a conspiracy does not have to be shown in order for a person to be categorized as a "tippee." If a person has access through an insider to information which should be used "only for a corporate purpose and not for the personal benefit of anyone," it follows that this person should be subject to the same duties and liabilities as an insider. Ross v. Licht, supra, at p. 409.

Accordingly, this Court finds that Kuehnert can be characterized as a tippee and a tippee stands in the same position as a corporate insider relative to the provisions of the Act and Rule 10b–5. The tippee such as Kuehnert must be painted with the same brush and the same color as the insider from whom the tippee receives his information.

As stated in Liberty Leasing Co. v. Hillsum Sales Corp., 380 F.2d 1013 (5th Cir. 1967):

"A summary judgment is to be granted only if the evidence before the court shows that there is 'no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' * * * The burden is upon the moving party to establish that there is no genuine issue of fact * * * and the party opposing the motion should be given the benefit of every reasonable doubt."

Accordingly, for the purposes of considering the motion for summary judgment, this Court accepts as true the facts relating as to how Kuehnert obtained his information, the fact that Kuehnert believed such information was material and confidential and such belief induced him to act in purchasing the stock, and that Kuehnert used this information for his own personal benefit. Therefore, this Court holds that Kuehnert was at the time what has been characterized as a tippee. This court further holds, as a matter of law, that Section 78j(b) of the Act and Rule 10b–5 were not intended to be and cannot be used by such a person to sustain a cause of action for fraud. It is the ordinary person that buys and sells securities based upon information generally available to the investing public who is protected by Section 78j(b) of the Act and Rule 10b–5 and not one that has access to or believes he has access to secret, material, confidential, corporate information.

Alternatively, the defense of in pari delicto asserted by defendants is good as against Kuehnert, although because of the above holding no further discussion of that doctrine and its applicability here is necessary. Also, there is no need to reach the issue of whether there was a fact question as to defendant Rhame acting within the scope of his employment.

Defendants' motion for summary judgment will be granted. Counsel for defendants will prepare and submit an appropriate order, after allowing counsel for Kuehnert the opportunity to inspect it and approve it as to form.