**R. J. BRYAN**

v.

**BROCK & BLEVINS CO., Inc., et al.**

**Civ. A. No. 2385.**

United States District Court,
N. D. Georgia,
Rome Division.

June 2, 1972.

Frank M. Gleason, Rossville, Ga., for plaintiff.

Stophel, Caldwell & Heggie, Chattanooga, Tenn., George P. Shaw, LaFayette, Ga., for defendants.

## ORDER

O'KELLEY, District Judge.

This action arises under Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C.A. § 78j]; and Rule 10b–5 of the Securities Exchange Commission [17 C.F.R. § 240.10b–5 (1964)]. This Court has jurisdiction of this action under Section 27 of said act, 15 U.S.C.A. § 78aa, as amended. Robert J. Bryan, plaintiff herein, has instituted this action for the purpose of permanently enjoining the proposed merger of Brock & Blevins Co., Inc. with Power Erectors, Inc., defendants herein.

Plaintiff is·a citizen and resident of Chattanooga, Tennessee. Defendants, Brock & Blevins Co., Inc. and Power Erectors, Inc., are business corporations, organized and existing under the laws of the State of Georgia. The registered agent for service of process for defendant, Power Erectors, Inc., is George P. Shaw, Attorney at Law, of LaFayette, Georgia.

This matter proceeded to trial before the Court without a jury on the question of a preliminary injunction and on the merits under the provision of Rule 65(a) (2), F.R.C.P. It having been determined that the plaintiff was mentally incompetent at the time of the hearing, the Court appointed Mrs. Amy E. Bryan, wife of plaintiff, as guardian ad litem.

The question presented to the Court is whether the acts of the defendants constitutes fraud so as to be in violation of the Securities and Exchange Act and the rules of the Commission promulgated thereunder.

## FINDINGS OF FACT

Brock & Blevins Co., Inc. (hereinafter Brock & Blevins), was incorporated in 1950 as a Georgia corporation having its principal place of business in Rossville, Walker County, Georgia. Prior to 1950, Brock & Blevins had operated as a partnership. The business of Brock & Blevins was the manufacture of machinery of all kinds; the maintenance, operation and conducting of foundaries and

foundry business; the maintenance and operation of machine shops, and assembly plants; the business of assemblying and erecting power plants, chemical plant equipment and other heavy machinery of any kind, character or description; engaging in the general steel and iron construction business; and the carrying on of a general industrial service and erection of all kinds of iron construction and industrial service. The original stockholders of Brock & Blevins were J. A. Brock, W. G. McGlothlin and H. E. Shrader.

Robert J. Bryan, a chemical engineer with a Bachelor of Science Degree from the University of Wisconsin, was employed by Brock & Blevins in 1955. Bryan's position with the company at that time was varied in that he was working on special problems, following up sales and contracts, and traveling. He maintained this status with the company for some two and one-half years at which time he was appointed General Manager on June 13, 1957. Bryan began serving on the Board of Directors of Brock & Blevins in 1960 and was elected to the office of Executive Vice-President in that same year. Bryan served on the Board of Directors and as an officer of the company from 1960 until his resignation on October 17, 1970. Bryan's resignation was predicated upon a severe problem in company management, and he felt that his termination as an active employee in the management of Brock & Blevins was for the best interest of the company's future. Bryan has retained his status as an inactive stockholder in the company up to the time of the threatened merger in December, 1971, of Brock & Blevins with Power Erectors, Inc.

The present company management maintains that there is a long-standing company policy of Brock & Blevins having only "active employees" as shareholders. They have used this policy to support the instigation of the threatened merger which is the foundation of this controversy. Asserting the existence of this company policy, the defendants have made various attempts to acquire Bryan's stock by what they describe as a "fair value" offer.

On October 14, 1970, the first attempt at such acquisition took place during a visit in Trenton, Georgia, between Bryan and Judge Paul W. Painter, a director of Brock & Blevins. Bryan indicated that he might possibly have contemplated a sale of his stock to the corporation for the purpose of getting new people in the company. The purchase price was to be based only upon agreeable terms, with Bryan's suggestion that an appropriate starting point might be the book value, plus additional factors to arrive at the value of the "going concern," and then take fifteen (15) percent of that calculation to represent his share. This particular meeting laid the foundation for the assumption that Bryan would sell if an attractive and deserving offer were negotiated.

Bryan was then contacted in May of 1971 by Judge Painter who initiated his interest in purchasing the stock. Bryan responded with a willingness to discuss the matter, but a formal meeting was never arranged. During this same interval of Judge Painter's correspondence, Bryan was contacted by Bill Hicks, an individual non-employee, who also expressed an interest in purchasing the stock. This expression of interest also failed to materialize.

Bryan was first approached with a value offer on August 21, 1971, during a luncheon engagement in Chattanooga with Judge Painter. Judge Painter conveyed an offer of $200,000 for the stock on the premise that he was the representative for the other "stockholders." Bryan's reaction to the offer was that the price was too low, and Judge Painter responded by saying that he was authorized to offer only $200,000 and that he could not negotiate further.

Bryan was not approached again until November 16, 1971, at which time Frost and Frost, Certified Public Accountants for defendant Brock & Blevins, acting through a partner, Jim Frost, called plaintiff to come to his office to discuss

"a problem." It was related that W. G. McGlothlin, president of Brock & Blevins, had engaged a Chattanooga law firm concerning this matter. A meeting was scheduled for November 18, 1971, at the offices of Frost & Frost. This meeting was attended by Sydney W. Carpenter, Attorney for the law firm of Stophel, Caldwell & Heggie of Chattanooga, representing Brock & Blevins; James B. Frost, Certified Public Accountant for Brock & Blevins; and Mr. and Mrs. R. J. Bryan. Carpenter informed Bryan that the "stockholders" wanted to buy his stock, but in so doing, they intended a fair treatment of Bryan. At the meeting, Bryan was given an appraisal prepared by Mr. Daniel W. Lattimore, an S.R.A. and M.A.I. appraiser and real estate consultant from Chattanooga, together with a number of analyzed reports, audits and balance sheets as an indication of Brock & Blevins' past economic history. Included within these documents was an unaudited calculation of the estimated progress of the company through June 30, 1971. Carpenter then submitted to Bryan two alternate offers, one of which would have to be accepted by noon on Monday, November 22, 1971. The offers were:

(1) Two Hundred Ninety Thousand ($290,000) Dollars cash for his stock or,

(2) Two Hundred Thousand ($200,000) Dollars cash for his stock, plus another Two Hundred Thousand ($200,000) Dollars over a ten-year period in return for an agreement not to compete with Brock & Blevins for the same ten-year period.

Carpenter stated that his law firm had advised McGlothlin that fundamental corporate changes would be necessary in order to acquire Bryan's stock if he refused to accept one of the offers, and the necessary legal proceedings would begin immediately upon such refusal. Bryan was fully apprised of the contemplated merger plan which would find him a dissenter and qualified to receive only appraisal remedies under the 1969 Georgia Corporation Statutes. Carpenter advised Bryan that the proposed merger plan would not be carried out if one of the two offers was accepted within in the allowable time period.

On November 19, 1971, Bryan called Frost to clarify whether or not the two offers were presented as an ultimatum, and Frost advised Bryan that the offers and deadline were intended as such. On November 22, 1971, Bryan let the deadline pass without a decision. Frost called Bryan and asked if a decision had been reached, and Bryan responded in the negative. Frost relayed the message to Carpenter, and on November 23, 1971, Carpenter called Bryan with an offer for more time in which to contemplate a decision. Bryan stated that such a time period would still be far too short and again contended the offer was far below the true value of the stock; and furthermore, he advised that he did not want to sell his stock. Carpenter then advised Bryan that appropriate legal proceedings would commence immediately.

On November 26, 1971, Judge Painter, a member of the Board of Directors of Brock & Blevins, approached Bryan, "as his friend," in order to admonish Bryan of the probable expenses to be realized when seeking the professional advice of an attorney in a situation of this nature.

On November 29, 1971, the "active" shareholders of Brock & Blevins entered into an agreement to form a new corporation, Power Erectors, Inc. Pursuant to the agreement, all shareholders in Brock & Blevins, except Bryan, exchanged their stock holdings in Brock & Blevins for a proportionate amount of stock in Power Erectors, Inc. As a result of that exchange, Power Erectors, Inc. became the owner of 85 percent of the stock in Brock & Blevins and Bryan remained as the owner of 15 percent of the stock. The initial Board of Directors of Power Erectors, Inc. was, W. G. McGlothlin, Paul W. Painter, J. E. Wright, N. A. Dunn and J. J. Underwood. W. G. McGlothlin was the incorporator and majority stockholder in Power Erectors, Inc. There were no

preemptive rights in that company. On November 30, 1971, Power Erectors, Inc. was duly incorporated under the Georgia corporation statutes having its principal place of business in Rossville, Walker County, Georgia.

On December 2, 1971, upon waiver of notice, a special meeting of the Board of Directors of Power Erectors, Inc. was held in Rossville, Georgia. As chairman of the meeting, W. G. McGlothlin stated that the purpose of the meeting was to consider recommending to the shareholders of the company a plan of merger whereby Brock & Blevins would be merged into Power Erectors, Inc. Upon motion duly made and seconded, the following resolution was unanimously adopted:

> RESOLVED, that the Board of Directors of Power Erectors, Inc. recommend to its shareholders that Brock & Blevins Co., Inc. be merged into Power Erectors, Inc. in accordance with the plan of merger which was presented and reviewed at this meeting; and
>
> FURTHER RESOLVED, that the secretary of this corporation be, and hereby is, instructed to give notice in accordance with law of a special meeting of the shareholders of Power Erectors, Inc. to consider this plan of merger, such meeting to be held at 316 Chickamauga Avenue, Rossville, Georgia, on December 22, 1971, at 10:00 A.M.

Under the plan of merger, the stock owned by Power Erectors, Inc. in Brock & Blevins would be cancelled and Bryan would receive $290,000 for his stock.

On December 2, 1971, a notice of the December 22, 1971, shareholders meeting of Brock & Blevins was mailed to Bryan and was received by him on December 3, 1971. Included in the notification were several reports and audits of Brock & Blevins' past economic history. It was reported in the notice that the 1971 profit and loss report of Brock & Blevins was included, when in fact the year had not ended. A highly contested factual dispute exists as to whether this indication was an error or an intentional act of fraudulent misrepresentation. The Court finds that it was a false statement, whether intended as such or not.

The plaintiff has alleged that the "plan of merger" is a device, scheme and artifice to defraud him of his status as a shareholder in an existing corporation. It is alleged that this is a violation of the Securities and Exchange Act and the General Rules and Regulations of the Securities and Exchange Commission, and this suit is instituted for the purpose of permanently enjoining the proposed merger of the two corporations.

## CONCLUSIONS OF LAW

The applicable part of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j provides:

> "It shall be unlawful for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> (a) . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5 of the Commission, 17 C.F.R. 240.10b–5 (1964) provides:

> "It shall be unlawful for any person, directly or indirectly by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a

material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or cause of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

The sole question for consideration by this Court is as stated above; whether the acts as alleged and proved by the plaintiff constitute fraud so as to be in violation of the 1934 Securities and Exchange Act and the rules of the Commission promulgated thereunder.

Exclusive jurisdiction in the United States District Court is provided for under 15 U.S.C. § 78aa:

"The district courts of the United States . . . shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder. . . . Any suit or action . . . to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business . . ."

█ In order to invoke proper jurisdictional requirements and to substantiate a cause of action under the Securities and Exchange laws, it must be shown that a "sale" of securities was consummated pursuant to the transaction. Under the theory expressed in Vine v. Beneficial Finance Company, 374 F.2d 627 (2nd Cir. 1967), the "plan of merger" constituted a sale of securities. This same principle was adopted by the Fifth Circuit in the case of Dudley v. Southeastern Factor and Finance Corporation, 446 F.2d 303 (5th Cir. 1971), where the Court in an exhaustive study of this subject, said,

" . . . a shareholder should be treated as a seller when the nature of his investment has been fundamentally changed from an interest in a going enterprise into a right solely to a payment of money for his shares." (p. 307)

Another requirement that must be satisfied under the applicable statutes is the "use of the mails." The defendants concede that the use of the mails was employed as a means of correspondence, and the Fifth Circuit allows for a private right of action when a violation of the Securities and Exchange laws arises through a use of the mail facilities. See, Hooper v. Mountain States Securities Corporation, 282 F.2d 195 (5th Cir. 1960). The Court finds as a matter of law that there was a sale of the securities by use of the mails, and that the United States District Court for the Northern District of Georgia is properly endowed with jurisdiction over the parties and subject matter of the controversy. See also, J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), where the Court said that federal courts will provide the remedies required to carry out the congressional purpose of protecting federal rights.

The basis of the defendants' contentions rest on the principle that the Georgia corporation statutes allow the majority stockholders of a corporation to force a minority shareholder to accept cash for his interest in the corporation through a merger agreement. In support of this argument, defendants have cited several state court decisions which adhere to this principle, and the defendants assert that this authority should be followed by this Court. A thorough investigation of this law by the Court reveals that several jurisdictions do, in fact, provide for such corporate procedures; however, only if no fraud be shown as an accompanying vice in accomplishing such transaction. Every case cited by defendants alternatively provides for equitable relief where there is fraud or illegality in a merger transaction, despite the existence of an appraisal remedy. In the absence of fraudulent activity in the merger proceedings, the defendants' position is conceivably supported by law.

The defendants have asserted the validity of their position even if the more restrictive procedures of Professor Vorenburg's Harvard Law Review article are followed. Exclusiveness of the Dissenting Stockholder's Appraisal Right, 77 Harv.L.Rev. 1189 (1964). The purpose of Professor Vorenburg's article was to suggest that only if there exists a "plausible business purpose" of the corporation beyond the desire of the majority to enhance their own stock holdings or merely eliminate a minority shareholder should the minority holder be forced into the position of a dissenter. Professor Vorenburg's analysis does not advocate an absolute right of minority elimination when appraisal remedies are available for fear that the allowance of an absolute freeze-out will enable the majority to contemplate a depressed market, invoke corporate merger procedures, and obtain the minority's shareholdings at a reduced value. In view of this learned approach, the Court's conclusion as to the status of the so-called long-standing company policy will determine the "plausible business purpose" doctrine.

In all due respect to the defendants' allegation that such policy is deeply entrenched in the corporation's philosophy, the Court's conclusion is that such policy was nonexistent. This factual dispute has been one of great concern to the Court, but a decision must be made and testimonial conflicts weigh in favor of the plaintiff as to the existence of such policy. Judge Painter had been Assistant Secretary of the company since May 9, 1959; and in the face of such deep-rooted company policy, he approached Bryan in an attempt to purchase his stock. Judge Painter was not then, and never has been, an active employee of the company. The Court is curiously puzzled as to Judge Painter's apparent unawareness of such a cohesive company force. The decision of Brock & Blevins' active shareholders to exchange their stock for that in Power Erectors, Inc. resulted in two shareholders in Brock & Blevins, (1) Bryan and (2) Power Erectors, Inc. Neither of these shareholders was or is an active employee of Brock & Blevins Co., Inc. Nowhere in the by-laws of Brock & Blevins does the Court find any reference to such long-standing company policy. Bryan himself testified in his deposition (p. 138) that he was unaware of any established company policy. Also, there was considerable evidence as to the possibility of going public which of course would be inconsistent with such alleged policy. Together with other factual disputes, the Court finds that the long-standing company policy was nonexistent. Without such support, the defendants' proposed merger transaction is void of a "plausible business purpose."

In analysis of the issue of fraud, the Court will consider its interpretation of the facts in view of the alleged statutory violation.

In the first instance, reference should be made to the basic principle of fiduciary relationships in a corporate structure. The old case of Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 284 (1939) expressed these principles most appropriately. In finding the director, as well as the dominant or controlling stockholder or group of stockholders, in a fiduciary capacity, the Court said:

"Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. . . . The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside." (p. 306, 60 S.Ct. p. 245)

The "active shareholders" and directors of Brock & Blevins were in a fiduciary relationship with Bryan at the time of their decision to exchange their stock

for stock in Power Erectors, Inc., and their decision can hardly be interpreted to have been made in the best interest of Bryan as a minority shareholder. Bryan was given no opportunity to exchange his Brock & Blevins stock for Power Erectors, Inc. stock. Instead, the active shareholders of Brock & Blevins, Bryan's fiduciaries, created an arbitrary requirement for stockholders in Power Erectors, Inc., which adhered to the alleged company policy of Brock & Blevins. The Court has previously determined that no such company policy prevails; and the inventive creation of such nebulous policy standard is a scheme and contrivance in violation of the parties' fiduciary trust.

In regard to the possibility of "going public" and acquiring Chattanooga Boiler and Tank Co., the Court finds that these possibilities had reached the status of probabilities and were of serious concern to all Brock & Blevins stockowners. The evidence before this Court reveals that these expansion considerations were rapidly approaching the consummation stage, and such probable enhancement of the company's business would certainly sway one's decision to sell or hold his company interests. Bryan had every right to this information, and the failure to disclose such developments was a manipulative and deceptive device in violation of the Securities and Exchange laws. The Court is unimpressed with the defendant's argument that Bryan was fully aware of the recent developments of these possible business moves. Bryan was not aware of their viable nature, and the full command of his decision necessitated such knowledge.

The manipulative and deceptive devices provision of the Securities Exchange Act is fully discussed in the case of Herpich v. Wallace, 430 F.2d 792 (5th Cir. 1970):

"By Section 10(b) Congress meant to prevent manipulation and control of the prices at which securities are bought and sold and to enable buyers, sellers, and traders of securities to make a proper appraisal of the value of the securities. . . . (p. 801) A fundamental purpose of the Act was 'to substitute a philosophy of full disclosure for the philosophy of caveat emptor'. . . . (p. 801) Together the section and the rule aim at reaching 'misleading or deceptive activities, whether or not they are precisely and technically sufficient to sustain a common law action for fraud and deceit,' . . . carried on 'in connection with' the purchase or sale of securities. They are not intended as a specification of particular acts or practices that constitute 'manipulative or deceptive devices or contrivances,' but are instead designed to encompass the infinite variety of devices that are alien to the 'climate of fair dealing' . . ." (p. 802)

The Court went further to say that the operative terms of the manipulative and deceptive devices rule must be given broad and flexible construction so as to effectuate the remedial purposes of the statute and rule. Any manipulative or deceptive device or contrivance which would cause a reasonable investor to rely thereon is meant to be outlawed. The provision is not so much concerned with fraud per se as it is with the effect of fraud upon the investor. The District Court in Kuehnert v. Texstar Corporation, 286 F.Supp. 340 (S.D.Texas 1968), expressed its interpretation of "fraud" within the Securities and Exchange laws; citing Cochran v. Channing Corp., 211 F.Supp. 239 (S.D.N.Y.1962):

"The Securities Exchange Act was enacted in part to afford protection to the ordinary purchaser or seller of securities. Fraud may be accomplished by false statements, a failure to correct a misleading impression left by statements already made or, as in the instant case, by not stating anything at all when there is a duty to come forward and speak. It is the use of the inside information that gives rise to a violation of Rule 10b–5." (p. 344)

The law is similarly stated in other jurisdictions and further recitation would

appear redundant. Suffice it to say that the acts alleged and proved fall within the statutory interpretations as set out above. See also, Heit v. Weitzen, et al., 402 F.2d 909 (2nd Cir. 1968). Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90 (10th Cir. 1971).

In conclusion, the Court must find a violation of the Securities Exchange Act and the rules of the Commission promulgated thereunder. The law as stated is obviously a protective device to discourage and hopefully prevent the very activities which transpired in this controversy. Although some authority exists which permits such corporate procedures, that authority terminates its permission when fraudulent activities are involved. The Court is aware that fraud is a most difficult and ambiguous area in which to reach supportable conclusions; however, legal precedent is a comforting guideline. This Court's review of the applicable legal precedent necessitates its conclusion. The information deliberately withheld from Bryan was an omission or failure to state a material fact and a statutory violation. The creative birth of Power Erectors, Inc., with its alleviating restrictions, was a device, scheme, or artifice to defraud Bryan of his stock. The Court has found that the sole purpose and intent of the organization of Power Erectors and the proposed merger was the elimination of the plaintiff. The proposed merger itself was a course of business which would operate as a fraud or deceit upon Bryan, in connection with the sale of his stock. It is of mysterious wonder to the Court as to why Brock & Blevins waited one year to effectuate what was claimed to be such a deep-rooted and stringent company policy. To allow Brock & Blevins to arbitrarily select a time in which to forcefully exclude a minority's interest through unlawful employment of an apparently lawful procedure is not to be condoned by this Court.

"Equitable relief against a freezeout is generally more appropriate where a close corporation is involved. Valuation difficulties caused by the absence of a market for the shares may vitiate his appraisal right, and even if he receives economic fair value, his personal 'proprietary' interest remains uncompensated." Freezing Out Minority Shareholders, 74 Harv.L.Rev. 1631 (1961).

The Court finds for the plaintiff and the petition to enjoin the proposed merger of Brock & Blevins Co., Inc. into Power Erectors, Inc. is hereby granted.