412 F.Supp. 45 (1976)
ST. LOUIS UNION TRUST COMPANY, a corporation, et al., Plaintiffs,
v.
MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED, a corporation, et al., Defendants.
No. 73 C 373 (1).
United States District Court, E. D. Missouri, E. D.
March 24, 1976.
*46 *47 Veryl L. Riddle, William H. Charles, John J. Hennelly, Jr., Bryan, Cabe, McPheeters & McRoberts, St. Louis, Mo., for plaintiffs.
John J. Cole, Thomas E. Wack, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., James B. May, Roger J. Hawke, Brown, Wood, Ivey, Mitchell & Petty, New York City, for defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
MEREDITH, Chief Judge.
This matter was tried to the Court without a jury. The Court has been duly informed by briefs, exhibits, depositions, and testimony.

Findings of Fact
1. Plaintiffs are the executors of the estate of Kenneth H. Bitting, deceased, and all are citizens of the State of Missouri.
2. Defendant Merrill Lynch, Pierce, Fenner & Smith, Incorporated (Merrill Lynch), is a corporation organized under the laws of the State of Delaware, with its principal place of business in New York City. It was incorporated on November 7, 1958. Prior to that time it had been a partnership. The defendant Donald T. Regan was president and a director of Merrill Lynch during 1970 and became chairman of the Board of Directors on January 1, 1971. *48 George L. Shinn was vice-chairman of the Board of Merrill Lynch and was in charge of planning in 1970. Ned B. Ball was a senior vice-president and a director of Merrill Lynch in 1970 and president in 1971. None of the individual defendants were residents of the State of Missouri at any time relevant to this suit.
3. Pursuant to the terms of Kenneth H. Bitting's last will and testament, the 40,000 shares of Merrill Lynch non-voting common stock owned by him at the time of his death were to become the corpus of the Kenneth H. Bitting revocable trust. The beneficiaries of that trust are the four Bitting children, Kenneth, Jr., William, George, and Barbara B. Fraser, and the deceased's wife, Esther C. Bitting.
4. Merrill Lynch is the largest firm in the securities industry. Its assets exceed three billion dollars. It has over 1,500,000 customers, 5,600 registered representatives, and 245 branch offices in the United States and several foreign countries, and employs over 20,000 people.
5. In 1947, Kenneth H. Bitting was a stockbroker in the City of St. Louis, Missouri. His partnership merged into and became the St. Louis office of Merrill Lynch. Bitting became an employee of the Merrill Lynch partnership and was in charge of its St. Louis office. He became a general partner in Merrill Lynch in 1951.
6. (a) When Merrill Lynch was incorporated in November of 1958, Kenneth H. Bitting received 9,100 shares of the corporation's voting common stock and a debenture in the amount of $58,000 in exchange for his partnership capital of $240,000.
(b) On October 30, 1959, Merrill Lynch split its common stock on a basis of three for one. Bitting's holding increased to 27,300 shares. In December 1962, Bitting retired. Upon retirement, under the provisions of the corporate charter, he sold his voting stock to the corporation, and received 10,000 shares of non-voting common stock and $423,642.40, representing the net book value of 17,300 shares as of December 28, 1962.
(c) On July 6, 1966, and on January 15, 1969, Merrill Lynch split its common stock on a two-for-one basis, resulting in Bitting's holdings having increased to 40,000 shares of non-voting common stock at the time of his death on October 8, 1970. The cost basis of this stock was $66,700.
7. Pursuant to Rule 313.21 of the New York Stock Exchange, the certificate of incorporation of Merrill Lynch contained provisions in Article VI, section (1)(a), granting the corporation the first right and option to purchase within a ninety-day period a stockholder's shares in certain events, including the death of the stockholder. In addition, subsection (1)(g) authorized a call whenever the Board of Directors determined, and a majority of the shareholders of voting stock agreed, that it was necessary for the welfare of the corporation. Subsection (10) required approval of any transferee by the exchanges, boards of trade, and similar institutions to which the corporation belongs, when such approval is a condition of the corporation's membership, and also triggered a new ninety-day option period if the holder could not secure an approved transferee within the original ninety-day period. The certificates of stock issued by Merrill Lynch provided that the owner, by accepting the certificate, expressly assented to the provisions of the certificate of incorporation.
8. The purpose of having two classes of common stock, voting and non-voting, was to comply with the rules of the New York Stock Exchange then in force, which limited the ownership of voting stock to persons who were full-time officers or employees of member firms. The rules of the New York Stock Exchange further required that approval be obtained from that Exchange when stock of member firms, which was restricted, was transferred to other persons.
9. After Bitting's death, Merrill Lynch exercised its option to purchase his 40,000 shares of non-voting common stock on November 18, 1970, and paid the estate $26.597 per share, the net book value, for a total sum of $1,063,880 on December 30, 1970. *49 At the same time, it permitted his widow to purchase 10,000 shares at a price of $26.597 per share. She was one of eleven other widows of Merrill Lynch stockholders who was permitted to acquire non-voting common stock at the death of her husband.
10. Merrill Lynch normally purchased all a partner's voting common stock when the partner retired and permitted him to purchase forty percent of that amount in non-voting stock. Merrill Lynch usually purchased all of the non-voting stock when the stockholder died, however, there were some exceptions made to this policy to take care of individual stockholders. The options to purchase the voting stock of Winthrop C. Smith and E. A. Pierce were not exercised when these two men became incapacitated and for all practical purposes retired. When Smith died in 1961, the corporation's option to purchase his stock was not fully exercised and some of the shares were transferred to a trust. The option to purchase Pierce's stock when he retired was not exercised, instead Merrill Lynch amended its certificate of incorporation to permit Pierce to own a class of preferred stock in exchange for his common. In the case of stock owned by the Charles E. Merrill trust, Merrill Lynch entered into a contract with the trust permitting the stock to be sold each year over a period of ten years, the last year being in 1976, and Merrill Lynch did not purchase that portion of the stock it was to purchase in the year 1971. Since the stock in the Charles E. Merrill trust had all the restrictions removed when Merrill Lynch went public on June 23, 1971, it did not fulfill these purchases, and the trust benefited accordingly. Upon the deaths of Francis D. Willis and Edward E. Bartlett, Jr., some of their stock went into trusts. The estates of James Dwyer, Austin Graham, and Joseph C. Quinn were permitted to retain some of their stock when those stockholders died. Those cases in which the option was not uniformly exercised, either at retirement or death, were to benefit the individual partner or his family. This leads the Court to the inescapable conclusion that the corporation had no uniform policy in exercising the options to purchase stock at retirement or death of a stockholder.
11. James E. Thompson, chairman of the Board of Merrill Lynch, retired on December 31, 1970, owning 130,000 shares of voting common stock. Merrill Lynch paid cash to Thompson for the net book value of 78,000 shares and permitted him to exchange 52,000 shares of voting common stock for non-voting common stock, which he retained. He would not have retired had he known Merrill Lynch was going public in June 1971, and was shocked when he learned the news in 1971.
12. Darwin Fenner, Kenneth W. Martin, and James D. Corbett were all directors and officers of Merrill Lynch in 1970. Fenner owned 325,000 shares of voting common stock, Martin owned 122,000 shares, and Corbett owned 75,600 shares. Upon their retirement on December 31, 1970, Merrill Lynch paid cash for the net book value of sixty percent of said shares and permitted a share-for-share exchange of its non-voting common stock for the remaining forty percent. Fenner was assured by Donald T. Regan in December 1970 that Merrill Lynch was not going public any time in the near future.
13. Donald T. Regan did not acquire any voting or non-voting common stock after 1960. George Shinn's last acquisition of stock, 1,000 shares, was in May 1970.
14. The restrictions on the stock served a valid purpose at the time Merrill Lynch was incorporated in 1958. That purpose was to comply with the rules of the New York Stock Exchange. Merrill Lynch was advised by counsel that these restrictions served a valid purpose and were binding at that time.
15. The Board of Directors of Merrill Lynch from the time of its incorporation through 1970 were all employees of Merrill Lynch. They had worked up the ladder through the firm. Management consisted of a very small group of from three to five people who made the decisions for the corporation. The chairman of the Board determined when a stockholder could increase *50 his holdings by additional purchases of stock. The chairman of the Board and the president determined when stockholders could advance from a non-voting status to a voting status. The chairman of the Board or the president determined whether the restrictions contained in Article VI of the Articles of Incorporation would be enforced in any given situation. The chairman of the Board and the president determined the composition of the Board of Directors.
16. In June 1969, the brokerage firm of Donaldson, Lufkin and Jenrette, a member of the New York Stock Exchange, announced that it would make a public offer of its securities. By so doing, this firm challenged the New York Stock Exchange rules prohibiting public ownership of member firms.
17. Merrill Lynch had long advocated public ownership of brokerage firms who were members of the New York Stock Exchange. Donald T. Regan was a member of the New York Stock Exchange Committee on Permissive Public Ownership of member firms. After the announcement by Donaldson that it was going public, the New York Stock Exchange committee quickly went to work and was asked to report its recommendations to the Board of Governors of the New York Stock Exchange for its July 17, 1969, meeting.
18. Along with these developments on the New York Stock Exchange, Regan requested Merrill Lynch's Corporate Planning Department to prepare a study on Merrill Lynch and public ownership. One problem with which Regan was concerned, if Merrill Lynch went public, was control of the company.
19. On September 8, 1969, the New York Stock Exchange Committee on Permissive Public Ownership issued its text of proposed constitutional amendments providing for public financing of member corporations. On September 18, 1969, the Board of Governors adopted the proposed amendments in principle. On February 12, 1970, the New York Stock Exchange Board of Governors announced that it had approved the proposed changes and on March 26, 1970, the proposed constitutional changes and rule changes were made, which permitted freely transferable securities to be held by member firms.
20. On February 19, 1970, Regan appointed a committee to study public ownership of Merrill Lynch under the direction of George L. Shinn, who was a director of Merrill Lynch and a member of the Executive Committee. At a March 12, 1970, meeting of the study committee to go public, Shinn coined the phrase "twilight zone." By this phrase he meant the period between the date when the broad decision to go public was made and the date when that decision became fully effectuated. One of the items the committee discussed was Merrill Lynch's legal responsibility to stockholders during the twilight zone. The committee concluded that further legal advice should be sought on Merrill Lynch's legal responsibility to its stockholders during that time. The record in this case is devoid of any opinions from counsel to Merrill Lynch, to its Board of Directors, to its officers, or anyone else concerning these legal responsibilities.
21. On March 16, 1970, Ross Kenzie, a committee member, wrote Shinn that there should be modifications of the restrictions on stock transfer after the decision to go public, but prior to the execution of that decision. On March 19, 1970, W. Eugene Cartwright wrote Shinn that there was a possible moral and legal responsibility to the estates of stockholders who die or retire during the twilight zone and that advice of counsel should be sought on the matter.
22. The final report of the study committee on going public was issued on April 3, 1970. This committee unanimously recommended that Merrill Lynch go public and they thought a reasonable target date for the achievement of public ownership would be May 1, 1971.
23. One of the major conclusions of the study committee report, and a concern of defendants throughout the twilight zone, was the necessity of increasing the per share earnings of Merrill Lynch stock.
*51 24. Shinn at no time communicated to the Board of Directors the question of potential legal responsibilities to stockholders during the twilight zone period. This was not discussed at any Executive Committee or Board of Directors meeting during 1970 and 1971. Shinn cautioned the members of his Study Committee not to discuss going public with anyone, except other committee members. On April 6, 1970, Shinn recommended to Merrill Lynch's Policy Committee that Robert Trone be appointed as the man to spearhead and coordinate the public ownership effort. Trone had fifteen years experience in the underwriting business and had worked on over one hundred public offerings. Trone's assignment was to be completed by July 14, 1970. He was to look into the question of Merrill Lynch going public from an underwriter's point of view.
25. On April 14, 1970, Merrill Lynch held its annual stockholders' meeting. Regan did not advise the stockholders that management had appointed a committee to study the question of public ownership. Nor did he advise them of the conclusions which that committee had reached.
26. On May 1, 1970, the Merrill trust by Henry Happel, a senior partner of the Brown, Wood law firm and secretary of the trust, postponed its scheduled 1970 sale of 34,344 shares of stock to Merrill Lynch until 1971.
27. On June 29, 1970, Trone submitted his report on the mechanics of going public to Shinn and called for a public offering in March of 1971. This report included strategy to prevent possible take-over bids or interference with management by large stockholders. Trone did not report his conclusions to the Board of Directors nor to the chairman of the Board of Directors, James E. Thompson. In June of 1970 it was generally known at Merrill Lynch that Thompson, the chairman of the Board, planned to retire in December 1970. Also it was generally known that Regan would succeed Thompson as chairman of the Board.
28. On July 6, 1970, Shinn recommended to Merrill Lynch's Executive Committee that it approve the creation of a task force to conduct an internal audit of the firm to advance the investigation of public ownership possibilities. On July 14, 1970, the Board of Directors approved the formation of a legal and accounting task force to conduct an audit of the firm's business and structure in preparation for public ownership at some time in the future and to improve the operations of the business. The Board of Directors was not informed on July 14, 1970, that this task force, which it created for possible future public ownership, did, in fact, take all steps necessary to actually have public ownership effectuated by the spring of 1971. Between July 1970 and April 1971, the task force was given no authority by the Board of Directors or the Executive Committee to employ outside auditors or to draft a registration statement. It did, in fact, however, hire Haskins & Sells on July 31, 1970, to prepare financial statements and ten-year audits for inclusion in a registration statement. Attorneys were employed to draft a prospectus.
29. Merrill Lynch's Executive Committee met on a weekly basis from July 14, 1970, through April 7, 1971, however, neither Shinn nor Regan reported to the Executive Committee of the task force timetable for going public. Between May and July 14, 1970, the Dow-Jones average had risen approximately one hundred points. It rose another one hundred points between July and December 1970.
30. On October 13, 1970, Merrill Lynch's Board of Directors held its regular meeting. George Shinn reported to the Board that the task force on public ownership was progressing, but he did not advise the Board that the outside auditors expected to complete the audit of the company by December 1970, nor did he report that the task force had consulted Merrill Lynch's lawyers, the Brown, Wood firm, to discuss the contents of a prospectus. Neither did Regan nor Ball report this to the Board, yet both were aware of the activities of the task force. At this meeting, Donald T. Regan was elected the next chairman of the Board and Ned B. Ball was elected the next president *52 of Merrill Lynch to take office as of January 1, 1971.
31. On October 28, 1970, Merrill Lynch's Board of Directors, under prodding from the New York Stock Exchange, voted to acquire Goodbody & Co. Goodbody was failing and Merrill Lynch took them over. This acquisition slowed to some extent the timetable for the public offering. However, on November 5, 1970, Haskins & Sells was engaged to audit Goodbody & Co., which was a necessary step to going public.
32. On November 18, 1970, Howard Sprow and Joseph Maiorca of Merrill Lynch and Ed Lill of Haskins & Sells met with the staff of the Securities and Exchange Commission to discuss the financial statements to be contained in the Merrill Lynch prospectus. The purpose of this meeting was to persuade the SEC to classify Goodbody & Co. as a non-significant subsidiary, so that separate financial statements for Goodbody would not have to appear in Merrill Lynch's prospectus. Regan was aware of this meeting with the SEC, however, Thompson, the chairman of the Board, had no knowledge of this meeting.
33. On the same day that the meeting was held with the SEC, November 18, 1970, Merrill Lynch notified plaintiffs by telephone and letter that it was enforcing the restrictions contained in Article VI to purchase the 40,000 shares of Merrill Lynch stock. Had the plaintiffs been aware at this time of the plans to go public in the spring of 1971, they would have resisted vigorously the sale of their stock to Merrill Lynch.
34. On October 30, 1970, Merrill Lynch held an aggregate of 6,323,584 shares of its stock in its treasury. It also had 4,835,100 authorized but unissued shares of common stock. On November 18, 1970, there was no legitimate business purpose for the enforcement of the restriction in Article VI of the Articles of Incorporation. There was no reason to purchase the plaintiffs' stock, except to reduce the number of shares outstanding in order to improve the price for the forthcoming public offering. On December 8, 1970, the Board of Directors increased the semiannual dividend from fifty cents to sixty-five cents per share. This was another twilight zone activity to increase the value of the stock at public offering.
35. On December 11, 1970, Haskins & Sells commenced its audit of Goodbody and agreed to have it completed within sixty days. It actually took about ninety days. On December 18, 1970, the task force met with Shinn. Their timetable called for a meeting with Brown, Wood on December 21, 1970, to review the first draft of the registration statement to be filed with the SEC on March 1, 1971, and to become effective on March 24, 1971.
36. On December 30, 1970, the task force on going public met with Chairman Regan, President Ball, Vice-chairman Shinn, General Counsel Sprow, Frady, and Spies. At this meeting Regan decided that the public offering would be 4,000,000 shares, 2,000,000 to be sold by the company, and 2,000,000 to be sold by stockholders; that a stockholder could sell no more than ten percent of his holdings; that the stock would be split three for one prior to the public offering. Prices of $28.00 to $30.00 per share were discussed as the price for the public offering after the three-for-one split. It was decided to submit the public ownership decision to the Board of Directors meeting in March 1971 for ratification and that the registration statement could be filed in the latter part of April 1971. This meeting also discussed an effort to get the National Association of Securities Dealers to permit a change in policy so that Merrill Lynch could sell its own stock.
37. On December 30, 1970, Merrill Lynch mailed its check for $1,063,880 to the plaintiffs for the purchase of their 40,000 shares of non-voting common stock.
38. On January 21, 1971, the National Association of Securities Dealers' Board of Directors informally accepted the policy to permit self-underwriting.
39. On February 2, 1971, Haskins & Sells advised Merrill Lynch that the Goodbody *53 audit would not be completed on February 11, 1971, as promised but promised to deliver it on March 15, 1971. Regan then decided that the three-for-one stock split would not be submitted to the regular March 9, 1971, meeting of the Board of Directors, as previously scheduled.
40. In February 1971, Charles Dougherty, an old friend of Regan's, was advised by Regan that he could keep his 6,000 shares of non-voting stock after his retirement on April 1, 1971.
41. On February 18, 1971, Brown, Wood submitted an application to the Internal Revenue Service requesting a ruling on the tax consequences of removing the restrictions on the transfer of Merrill Lynch stock. The application stated that management had decided that Merrill Lynch needed additional capital; that a registration statement and prospectus would be filed with the SEC around May 1, 1971; that the total price of the offering would be around $50,000,000; that the sole purpose of the restrictions in Article VI of the Articles of Incorporation was to comply with the New York Stock Exchange regulations and these restrictions were about to be removed in light of the public offering.
42. In November 1970, Ball purchased 1,000 shares of Merrill Lynch stock and in February 1971 another 3,000 shares. During Feb. 1971 General Counsel Sprow purchased 5,000 shares, and task force member Spies purchased 1,000. All of this stock was purchased at book value and tripled in value on June 23, 1971, when the public offering was made.
43. On March 9, 1971, Regan reported to the Merrill Lynch Board of Directors that the firm had made no plans with respect to the public offering of the company stock. He has stated his reason for this was to protect them from the consequence of having this advance knowledge.
44. On March 12, 1971, Haskins & Sells submitted a draft report of its Goodbody audit to Merrill Lynch. On that same day, Regan, Shinn, and Ball decided that all the preparations for the public offering were completed and the company was ready to file its registration statement. The defendants contend that this is the date on which management's decision to go public was made. This Court finds that the decision to go public was made by management on July 14, 1970. This decision included a target date for the spring of 1971, even though the date was delayed because of the Goodbody acquisition, and the going public was accomplished on June 23, 1971.
45. On April 7, 1971, Shinn reported to the Executive Committee that Merrill Lynch was ready to go public and recommended its approval by the Board of Directors. This was the first time that the Executive Committee of the Board was advised of this decision.
46. On April 8, 1971, the Board of Directors approved the decision to go public and also approved the necessary amendments to the Merrill Lynch Certificate of Incorporation, removing the restrictions. The Board also approved a stock option plan for employees. On April 9, 1971, the Board further decided not to enforce the restrictions to purchase stockholders' stock on death or retirement from that day forward, resulting in the following actions:
a. April 9, 1971, Albert G. Boesel, holding 1,600 pre-split non-voting shares died. Merrill Lynch did not exercise its option to purchase his stock.
b. April 15, 1971, Harry B. Anderson, a director of Merrill Lynch, transferred beneficial ownership in several hundred shares of Merrill Lynch voting stock to his five children.
c. On May 23, 1971, Walter B. Honsberger, a retired employee of Merrill Lynch, holding 6,400 pre-split non-voting shares of stock, died. The corporation did not exercise its option to purchase his stock.
d. On May 28, 1971, Theodore Weincoff, a retired Merrill Lynch employee, holding 4,000 pre-split shares of non-voting stock, died. Merrill Lynch did not exercise its option to purchase his stock.

*54 e. On June 13, 1971, Byron G. Webster, a retired Merrill Lynch employee, holding 29,000 pre-split shares of non-voting stock, died. The corporation did not exercise its option to purchase this stock.
47. On April 12, 1971, Merrill Lynch publicly announced it intended to file a registration statement with the SEC and go public. This was approved by the stockholders of Merrill Lynch on April 20, 1971, who approved the necessary amendments to the Certificate of Incorporation.
48. On April 23, 1971, Merrill Lynch filed its registration statement with the SEC, stating the maximum offering price was expected to be about $35.00 per share.
49. On May 8, 1971, the National Association of Securities Dealers mailed to its members a proposed rule to permit self-underwriting.
50. In early May 1971, Merrill Lynch retained First Boston Corporation, Morgan Stanley, and Lehman Brothers to appraise the corporation stock and recommend a public offering price.
51. On June 23, 1971, Merrill Lynch went public, the stock was split three for one and reclassified as voting stock. All restrictions were removed. The total offer was 4,000,000 shares, 2,000,000 by the corporation and 2,000,000 by the shareholders. The offering price was $28.00.
52. Between July 14, 1970, and April 9, 1971, Merrill Lynch reduced the number of its outstanding shares by approximately 670,000 by exercising its options to purchase shares of stock of retired employees and those who had died. This number of shares became approximately 2,000,000 shares when the three-for-one split became effective, and were sold to the public for $28.00. The 2,000,000 shares cost the corporation approximately $9.00 per share. These were sold for $28.00 per share to the public, making a net gain of $19.00 per share, or approximately $38,000,000, which the corporation realized as a result of exercising its options after the decision to go public was made and before it was announced.
53. Of the public offering of Merrill Lynch stock, 400,000 shares were reserved for and purchased by its employees.
54. On June 23, 1971, Regan owned 288,000 shares of Merrill Lynch stock, with a market value of $8,000,000. His annual compensation for the previous year was $209,000. On that date Shinn owned 63,000 shares of Merrill Lynch stock, with a market value of about $1,760,000. His annual compensation for the previous year was $134,000. On that same date, Ball owned 150,000 shares of Merrill Lynch stock, with a market value of $4,200,000. His annual compensation for the previous year was $108,000.
55. On July 12, 1971, Shinn wrote an article appearing in Merrill Lynch's in-house newspaper that the corporate decision to go public was made at the Board of Directors' meeting on July 14, 1970. Shinn prepared the statement appearing in the article in response to written questions submitted to him by the newspaper's editor. Shinn reviewed a draft of the article for accuracy prior to publication. His answers were reviewed by the legal department of Merrill Lynch prior to publication.
56. On August 23, 1971, in an article in the in-house journal of Merrill Lynch "We The People", Frady in an interview, stated that management made the decision to go public on July 14, 1970, with a goal of having a public offering in the spring of 1971. Frady reviewed this article prior to publication; it was reviewed by Merrill Lynch's legal department prior to publication.
57. Plaintiffs first learned about these two July and August articles during the fall or winter of 1971.

Conclusions of Law
1. This Court has jurisdiction of the parties and the subject matter of this action based on the diversity of citizenship of the parties and based on section 27 of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78aa (1971), and pendent jurisdiction *55 over state claims which derive from the same facts as the federal claim.
2. The claims presented to this Court for determination are plaintiffs' claims of common law fraud and breach of fiduciary duty, and violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5, promulgated thereunder, against Merrill Lynch and the individual defendants for damages plaintiffs sustained from the fraudulent purchase of their 40,000 shares of Merrill Lynch stock by the corporation.
3. Plaintiffs' claims are not barred by the applicable federal, Missouri, and Delaware statutes of limitations. A cause of action under section 10(b) and Rule 10b-5 does not accrue until the fraud is or should be discovered. Vanderboom v. Sexton, 422 F.2d 1233 (8th Cir. 1970), cert. denied, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970). Since plaintiffs did not learn and were not put on notice that the November 18, 1970, call was fraudulent until the publication of the articles in the July 12 and August 23, 1971, issues of the Merrill Lynch house organ, the action did not accrue until July 12, 1971. The complaint was timely filed on June 6, 1973. See Vanderboom v. Sexton, supra [statute of limitations for 10b-5 claim is analogous state blue-sky statute, two years under section 409.411, R.S.Mo. (1967)]. The action is clearly within the five-year limitations period for common law fraud under section 516.120, R.S.Mo. (1949), and the three-year limitations period for breach of fiduciary duty under Del.Code Ann., Title 10, § 8106 (1970). See Bokat v. Getty Oil Co., 262 A.2d 246 (Del.1970).
4. Rule 10b-5
(a) Rule 10b-5 of the Securities and Exchange Commission provides:
"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
"(a) To employ any device, scheme, or artifice to defraud,
"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
`in connection with the purchase or sale of any security."
(b) The nondisclosure of material inside information in connection with the purchase or sale of securities, constitutes a violation of Rule 10b-5. Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 495 F.2d 228 (2d Cir. 1974); Securities and Exchange Commission v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968)(en banc), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).
". . . material facts include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." Texas Gulf Sulphur, 401 F.2d at 849.
Whether or not information is material ". . . will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." Id.
(c) The evidence establishes that months prior to the purchase of plaintiffs' stock, defendants were firmly committed to a public offering, any remaining contingencies, including the Goodbody takeover, affecting only the timing of the offering. Certainly the decision of the largest brokerage company in the country to go public was information which would have a significant impact on the future of the corporation, *56 and on the investment decisions of potential purchasers and sellers of its securities. The former chairman of the Board, who was not informed of the pending offering, testified that he would not have retired, thus subjecting his stock to the call option, had he known of the imminence of the offering. That the offering would have a significant effect on the price of the stock is reflected in the evidence which shows that at the time plaintiffs' stock was purchased, defendants contemplated a three-fold increase in the price of the stock.
(d) The nondisclosure was part of a scheme to maintain management control and to increase the per share earnings of Merrill Lynch stock prior to a public offering at the expense of plaintiffs and other non-employee shareholders. A means of accomplishing these purposes lay near at hand: exercising the corporation's option to call the stock of shareholders who had left the employ of Merrill Lynch through termination, retirement, or death. The option was exercised pursuant to a stock transfer restriction which by its own terms was to be exercised solely for the purpose of complying with the rules of the New York Stock Exchange regulating privately-held member brokerage houses.
(e) Defendants argue that they are protected from liability under Rule 10b-5, and from common law tort liability, because they had an absolute contractual right, under Article VI of the Certificate of Incorporation, to exercise the call option. The validity of the stock transfer restriction which Merrill Lynch exercised in calling plaintiffs' stock must be determined under Delaware law. B & H Warehouse, Inc. v. Atlas Van Lines, Inc., 490 F.2d 818, 821 (5th Cir. 1974); 2 Restatement (Second) on Conflict of Laws § 303 (1971). Section 202 of the Delaware General Corporation Law of 1967, Del.Code Ann., Title 8, § 202 (1967), governing restrictions on the transfer of securities, reads in pertinent part:
"(a) A written restriction on the transfer or registration of transfer of a security of a corporation, if permitted by this section and noted conspicuously on the security, may be enforced against the holder of the restricted security or any successor or transferee of the holder including an executor, administrator, trustee, guardian or other fiduciary entrusted with like responsibility for the person or estate of the holder.
". . .
"(c) A restriction on the transfer of securities of a corporation is permitted by this section if it;
"(1) Obligates the holder of the restricted securities to offer to the corporation or to any other holders of securities of the corporation or to any other person or to any combination of the foregoing, a prior opportunity, to be exercised within a reasonable time, to acquire the restricted securities, or
"(2) Obligates the corporation or any holder of securities of the corporation or any other person or any combination of the foregoing, to purchase the securities which are the subject of an agreement respecting the purchase and sale of the restricted securities; or
"(3) Requires the corporation or the holders of any class of securities of the corporation to consent to any proposed transfer of the restricted securities or to approve the proposed transferee of the restricted securities; or
"(4) Prohibits the transfer of the restricted securities to designated persons or classes of persons, and such designation is not manifestly unreasonable.
"(d) Any restriction on the transfer of the shares of a corporation for the purpose of maintaining its status as an electing small business corporation under sub-chapter S of the United States Internal Revenue Code is conclusively presumed to be for a reasonable purpose.
"(e) Any other lawful restriction on transfer or registration of transfer of securities is permitted by this section."
(f) A restriction falling within the section 202(e) catchall provision must meet the standards of reasonableness developed *57 in Delaware case law, while a restriction expressly permitted by any of the four subsection (c) categories is arguably per se validated. E. L. Folk, III, The Delaware General Corporation Law: A Commentary and Analysis, 200 (1972); Comment, Section 202 of the Delaware General Corporation Law: Per Se Rules for Stock Transfer Restrictions, 9 B.C.Inc. & Com.L.Rev., 405, 411 (1968). The challenged restriction does not fall within subsection (c) since that subsection applies only to voluntary transfers, not transfers by operation of law as here. Comment, supra, at 414. Cf. In re Riggs v. Midwest Steel & Iron Works, 540 P.2d 361 (Colo.App.1975); Globe Slicing Machine Co. v. Hasner, 333 F.2d 413 (2d Cir. 1964), cert. denied, 379 U.S. 969, 85 S.Ct. 666, 13 L.Ed.2d 562 (1965).
(g) Moreover, Article VI, which in subsection (1)(a) authorizes a call upon the death of a holder of common stock, contains further restrictions: the triggering of additional ninety-day option periods whenever necessary for the welfare of the corporation and whenever an approved transferee cannot be found within the original ninety day period, and the requirement of the New York Stock Exchange approval for all proposed transferees. These additional restrictions must be considered in determining the statutory classification of the option.
(h) Even assuming the restriction were per se legal under subsection (c)(1), it would be invalid if exercised for a fraudulent purpose. Green v. Santa Fe Industries, Inc., 533 F.2d 1283 (2d Cir. 1976) (short form merger legal under Delaware law violation of Rule 10b-5 where consummated without any justifiable corporate purpose and to the detriment of minority stockholders); Bryan v. Brock & Blevins Co., Inc., 343 F.Supp. 1062 (N.D.Ga.1972), aff'd on other grounds, 490 F.2d 563 (5th Cir. 1974), cert. denied, 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974) (short form merger legal under Georgia law and justified on alleged policy of "active employee" ownership, a policy the court found nonexistent, held violation of Rule 10b-5 where defendants failed to disclose plans for going public and where sole purpose of merger was to freeze out the minority shareholder.)
(i) Defendants stress the argument that the option was a binding contractual obligation, regardless of the purpose for which it was exercised and regardless of what information was available to plaintiffs. In another merger case, Voege v. American Sumatra Tobacco Corp., 241 F.Supp. 369 (D.Del.1965), the Court noted that the Delaware merger statute constituted a part of the charter of the corporation and as such a contract between the corporation and its shareholders, giving rise to an option to purchase upon merger. The Court held, however, that plaintiff stated a claim by her allegations that the merger, which, under Delaware law needed no justification, was undertaken for the sole purpose of defrauding plaintiff and other minority shareholders. "Every contract contains the implied condition that the parties to it will act in good faith and deal fairly with each other in its performance." Id. at 375. In Drachman v. Harvey, 453 F.2d 722 (2d Cir. 1972), the Court, in rehearing en banc, invalidated a technically legal call on debentures where the call was exercised for the improper purpose of cementing the control of the majority shareholder by eliminating the possibility that the debenture holders would exercise their right to convert to common stock. This decision overturned an earlier panel's decision that the call was valid because ". . . the redemption was effected in accordance with the terms of the debentures." Id. at 732.
(j) In the foregoing discussion, the Court has assumed that the restriction was valid under section 202(c)(1). However, the nature of the restriction has led the Court to find that the option is not validated per se under subsection (c)(1), but must be tested under the reasonableness standard of subsection (e). Under that standard, the option was invalid as exercised. Professor Folk, Official Reporter and Adviser to the Delaware Committee on the Revision of the General Corporation Law, has summarized the factors to be weighed in determining *58 the validity of a restriction under section 202(e):
"[A]pplying the common law test normally involves balancing the need for the restriction and the traditional judicial policy favoring free transfer of securities. Weighed in this balance would be the size of the corporation, its purposes, the number and character of its stockholders, the possibility that outsiders may harm the corporation by acquiring its stock, the strictness and duration of the restraint itself, and the availability of a lesser restraint to serve the professed need." The Delaware General Corporation Law, supra, at 200.
Lawson v. Household Finance Corp., 17 Del.Ch. 343, 152 A. 723 (1930); Greene v. E. H. Rollins & Sons, Inc., 22 Del.Ch. 394, 2 A.2d 249 (1938); Tracey v. Franklin, 31 Del.Ch. 477, 67 A.2d 56 (1949). B & H Warehouse, Inc. v. Atlas Van Lines, Inc., supra (applying Delaware law).
(k) Since plaintiffs do not attack the validity of the restriction on its face, but only as applied after the July 14, 1970, decision to go public, the Court assumes that the restriction was valid before the decision to go public. See Ling & Co. v. Trinity Savings and Loan Ass'n, 482 S.W.2d 841 (Tex. 1972).
(l) Article VI of the Merrill Lynch Certificate of Incorporation states that the restrictions are imposed "in order to enable the Corporation to qualify for membership privileges on various securities exchanges . . . and in order to insure that the business of the Corporation will be carried on in a manner consonant with the Corporation's responsibilities to the public as an organization so qualified." The Corporation, in a February 19, 1971, letter to the Internal Revenue Service regarding tax treatment of cancellation of the restrictions in connection with the public offering, stated that the restrictions ". . . were imposed solely to implement the Exchange restrictions upon ownership of stock in a member corporation." The Court, in Tracey v. Franklin, supra, 67 A.2d at 59, clearly held that ". . . unless restraints are imposed for purposes recognized as sufficient, they will be held invalid." Similarly, in Greene v. E. H. Rollins & Sons, Inc., supra, 2 A.2d at 252, the Court invalidated a restraint which was not shown to be ". . reasonably necessary to advance the corporation's welfare and promote business success." Under this standard, once the stated sole purpose of a restraint fails, the restraint itself becomes invalid. By their own words, defendants have shown their contractual rights to be contingent on the Exchange requirements. The Exchange requirements could have been met by merely removing all restrictions from all stock at any time after March 26 1970.
(m) Defendants argue that even if the stated purpose of the restraint was no longer valid, other valid purposes, such as making stock available for the employee stock purchase plan, were served. In support of this contention defendants cite Ryan v. J. Walter Thompson Co., 453 F.2d 444, 446 (2d Cir. 1971), cert. denied, 406 U.S. 907, 92 S.Ct. 1611, 31 L.Ed.2d 817 (1972). In Ryan, the plaintiffs contended that the call options when exercised were invalid because their underlying purpose, employee ownership of the stock, was no longer valid once the corporation had decided to go public. The Court rejected this argument on the grounds that, ". . . under New York law . . . regardless of the corporate policy underlying the option agreement, such agreement would be invalid only if it prevented transfer of the stock, as opposed to merely delaying transfer." 453 F.2d at 446. This may be a correct reading of New York law, but Delaware law is clearly to the contrary. The Court, in Greene v. E. H. Rollins & Sons, Inc., supra, held a first option invalid where the purported purpose, a policy of employee ownership of stock, was not a true policy of the corporation and had never before been consistently followed. Accord, B & H Warehouse, Inc. v. Atlas Van Lines, Inc., supra.
(n) Defendants' argument that the restriction remained necessary to maintain the corporation's exemption from section *59 12(g) of the Securities Exchange Act of 1934 and from section 4(1) of the Securities Act of 1933 is without merit since a lesser restraint could have been used to accomplish the same purpose.
(o) Defendants also argue that even if the decision to go public were made in July 14, 1970, they were still required by the rules of the New York Stock Exchange to maintain the restrictions until they actually had freely transferable stock outstanding. This argument is refuted first by defendants' decision not to exercise the call option on several employees who died after April 8 1971, the date when the Board was first informed of the decision to go public, and June 23, 1971, the date of the public offering. Their contention that the transferee trust was ineligible under the Exchange rules, since two of the plaintiff trustees were engaged in the securities business with a firm other than the member corporation, is likewise belied by previous action of defendants in allowing potential transferees an opportunity to arrange their affairs so they could qualify. The Exchange requirements that the corporation keep a certain percentage of its stock in the hands of active employees, have a call option as to each class of stock "none of which is to be freely transferable," and maintain the necessary restrictions in its corporate charter did not require that the defendants exercise the options maturing after the July 1970 decision to go public. The defendants had a comfortable cushion in meeting the Exchange's active employee percentage requirement.
(p) As additional protection in case the ratio shifted out of line with the Exchange requirements (as to percentages of stock owned by employees) before the public offering was completed, defendants could have availed themselves of the section (1)(g) option which was exercisable whenever necessary for the welfare of the corporation. The defendants were protected from charges of discrimination for not strictly exercising all matured options by the section 2 waiver clause, used previously in selected cases.
(q) In addition to Ryan v. J. Walter Thompson Co., supra, defendants cite as controlling Blackett v. Clinton E. Frank, Inc., 379 F.Supp. 941 (N.D.Ill.1974). In that case, a former chairman of the Board challenged a call exercised upon his involuntary termination on the grounds that the corporation had failed to disclose that it had decided to go public, to declare for the first time a cash dividend, and to split its stock on a two-for-one basis. The Court found that the corporation maintained a strict policy of employee ownership, and that plaintiff had signed a written agreement reciting that the corporation was "required" to purchase the shares, and specifically referring to the possibility of a public offering, stating that the agreement would continue to apply until such time as a registration statement became effective or the corporation was listed on a stock exchange. The Court held that the restriction, because of its specific terms and because plaintiff had not properly pleaded its invalidity, was valid as exercised.
(r) Defendants argue that even if the restriction was invalid as exercised, they have not violated Rule 10b-5 since the allegedly nondisclosed material inside information was, in fact, available to plaintiffs through extensive newspaper publicity given to the potential public offering. It is true that a 10b-5 claim cannot be based on failure to disclose facts which were publicly available or to which plaintiff had access from other sources. Arber v. Essex Wire Corp., 490 F.2d 414 (6th Cir. 1974), cert. denied, 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 56 (1974); Johnson v. Wiggs, 443 F.2d 803 (5th Cir. 1971). However, plaintiffs, although they may have been aware of the general possibility of a public offering at some indefinite time in the future, clearly did not know of the viable nature of such an offering. A proper exercise of their decision to sell necessitated such knowledge. It would be incongruous to hold a member of the public to such a standard of knowledge in November and December of 1970 when the Corporation's own former chairman of the Board testified that he would *60 not have retired in December of 1970 had he known of the imminence of the offering.

5. Common Law Fraud

(a) Plaintiffs also charge defendants with common law fraud. In order to determine what substantive law to apply, the Court must look to the choice of law rules of Missouri, the forum state. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under Missouri's choice of law rules, which follow the most significant contact doctrine adopted in 1 Restatement (Second) on Conflict of Laws, § 145 (1971), Missouri law generally applies since the nondisclosure, the action in reliance upon the nondisclosure, and the pecuniary harm suffered therefrom all took place in Missouri. General Dynamics Corp. v. Selb Mfg. Co., 481 F.2d 1204 (8th Cir. 1973), cert. denied, 414 U.S. 1162, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974); State ex rel Broglin v. Nangle, 510 S.W.2d 699 (Mo.1974) (en banc); Kennedy v. Dixon, 439 S.W.2d 173 (Mo.1969) (en banc).
The elements of common law fraud are:
". . . a representation; its falsity; its materiality; the speaker's knowledge of the falsity or his ignorance of its truth; the speaker's intent that his statement should be acted upon by the person and in the manner reasonably contemplated; the hearer's ignorance of the falsity of the statement; his reliance on its truth; his right to rely thereon; and his consequent and proximately caused injury." Ackmann v. Keeney-Toelle Real Estate Co., 401 S.W.2d 483, 488 (Mo.1966) (en banc).
(b) Nondisclosure or silence, as well as active misrepresentation, may constitute fraud:
"It is a general doctrine that, if either party to a transaction conceals some fact which is material, which fact is within his own knowledge, and which it is his duty to disclose, he is guilty of fraud . . . [T]he buyer is [not] bound to reveal all facts known to himself which would enhance the value of the article sold or affect the conduct of the vendor (except where the parties stand in some fiduciary relationship to each other involving the requisite exercise of good faith.)" Ash Grove Lime & Portland Cement Co. v. White, 361 Mo. 1111, 238 S.W.2d 368, 372 (1951).
See Miller v. Higgins, 452 S.W.2d 121 (Mo. 1970); Hockenberry v. Cooper County State Bank, 338 Mo. 31, 88 S.W.2d 1031 (1935).
(c) Although Missouri law generally applies to this claim, the extent and nature of the relationship between the corporation and the stockholder must be determined under the law of Delaware, the state of incorporation. See Zahn v. Transamerica Corp., 162 F.2d 36 (3d Cir. 1947); 1 Restatement (Second) on Conflict of Laws, § 309 (1971). Under Delaware law ". . . directors generally do not occupy a fiduciary position vis à vis individual stockholders in direct personal dealings as opposed to dealings with stockholders as a class." Kors v. Carey, 39 Del.Ch. 47, 158 A.2d 136, 143 (1960). However, such duty does arise ". . . in special cases where advantage is taken of inside information" as where "a buyer possessed with special knowledge of future plans or of secret and untapped resources deliberately misleads an ignorant stockholder." Id. Accord, Lank v. Steiner, 224 A.2d 242 (Del.1966). Missouri seems to follow the same rule. See Gieselmann v. Stegeman, 443 S.W.2d 127 (Mo.1969); Morrow v. Franklin, 289 Mo. 549, 233 S.W. 224 (1921); Wann v. Scullin, 210 Mo. 429, 109 S.W. 688 (Mo.1908).
(d) Defendants, as officers and directors in possession of inside information which could have a significant impact on the value of plaintiffs' stock, had a fiduciary duty to disclose such information and acted fraudulently in failing to disclose that information to plaintiffs before purchasing their stock. Defendants' arguments regarding the Corporation's contractual right to purchase the stock, plaintiffs' knowledge of the offering and the uncertainty of the offering at the time of the purchase are *61 rejected for the reasons set forth in the discussion of plaintiffs' Rule 10b-5 claim.
(e) Since the fraudulent acts of the individual defendants were committed while they were acting within the scope of their authority and in the course of their employment as officers and directors of Merrill Lynch, the Corporation, as well as individual defendants, is liable to plaintiffs. Webb Agency, Inc. v. Commercial Standard Ins. Co., 333 F.Supp. 966 (E.D.Mo.1971); United States v. U.S. Cartridge Co., 198 F.2d 456 (8th Cir. 1952), cert. denied, 345 U.S. 910, 73 S.Ct. 645, 97 L.Ed. 1345 (1953). Additionally, the Corporation received the benefit of the acts of its officers in recalling stock that became approximately three times more valuable than the acquiring price, and it took no steps to rescind the transaction.

6. Breach of Fiduciary Duty

Under Missouri choice of law rules, supra, Delaware law determines the existence and extent of a director or officer's liability for a breach of fiduciary duty to the corporation's stockholders.
Under Kors v. Carey, supra, and for the reasons stated above, individual defendants as officers and directors owed plaintiff shareholders a fiduciary duty to disclose the pending public offering before purchasing their stock. Because individual defendants were acting within the scope of their authority and employment, the Corporation is also liable for its employees' tortious conduct. See Soraghan v. Henlopen Acres, Inc., 236 F.Supp. 489 (D.Del.1964).

7. Damages

(a) At the time the defendant Corporation exercised the call to purchase the 40,000 shares at book value from the Bitting estate, it allowed Mr. Bitting's widow to purchase 10,000 shares at book value. Because of the substantial identity of interest between Mr. Bitting's estate and Mrs. Bitting, damages will be based on 30,000 rather than 40,000 shares.
(b) The measure of damages for a defrauded seller under Rule 10b-5 is the difference between the price received and the fair value of what the seller would have received had there been no fraudulent conduct, here the value of the stock at the time of the transaction. Affiliated Ute Citizens v. United States, supra; Ross v. Licht, 263 F.Supp. 395 (S.D.N.Y.1967). The evidence establishes that plaintiffs' stock was worth approximately $75.00 per share at the time that defendants purchased it for $26.597 per share, or $48.403 less per share than the plaintiffs were entitled to receive. While the 30,000 shares at issue had a fair value of $2,250,000, plaintiffs were paid only $797,910. Their loss, accordingly, is 30,000 times $48,403, or a total of $1,452,090, which amount is awarded as actual damages.
(c) An award of prejudgment interest for violation of Rule 10b-5 rests within the equitable discretion of the Court. Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 516 F.2d 172 (2d Cir. 1975), petition for cert. filed, 44 U.S.L.W. 3215 (U. S. Oct. 7, 1975) (No. 353). Interest will be assessed at the rate of six percent simple interest per annum on the sum of $1,452,090, from January 1, 1971.
(d) Punitive damages are not recoverable under Rule 10b-5 since recovery is limited under section 28(a) of the 1934 Act, 15 U.S.C. § 78bb(a), to actual damages. deHaas v. Empire Petroleum Co., 435 F.2d 1223 (10th Cir. 1970); Myzel v. Fields, 386 F.2d 718, 748 (8th Cir. 1967) (dictum), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). However, punitive damages may be awarded when available under state law in an action where state law violations are joined with the federal claim. Coffee v. Permian Corp., 474 F.2d 1040 (5th Cir. 1973), cert. denied, 412 U.S. 920, 93 S.Ct. 2736, 37 L.Ed.2d 146 (1973).
(e) Punitive damages, which are awarded by way of punishment to deter defendants from future similar acts of misconduct, are recoverable in Missouri where defendant's tortious conduct was willful, wanton, malicious, or so reckless as to be in utter disregard of the consequences. Genie *62 Machine Products, Inc. v. Midwestern Machinery Co., 367 F.Supp. 897 (W.D.Mo.1974); McClellan v. Highland Sales & Investment Co., 484 S.W.2d 239 (Mo.1972); Warner v. Southwestern Bell Telephone Co., 428 S.W.2d 596 (Mo.1968). Punitive damages are similarly available under Delaware law. Sheats v. Bowen, 318 F.Supp. 640 (D.Del. 1970). This is a proper case for punitive damages. Defendants, in conscious disregard of plaintiffs' legal rights and owing plaintiffs a fiduciary duty, deliberately availed themselves of material inside information and increased the value of their holdings three-fold at plaintiffs' expense. A total of 670,000 pre-split shares were illegally called after the decision to go public, netting the Corporation a gain of approximately $38,000,000. Punitive damages are awarded in the amount of $2,000,000, approximately the amount of the judgment with the interest included. The award of actual damages, interest, and punitive damages is made to the plaintiffs jointly against all defendants.