602 F.2d 84
 GOODPASTURE, INC., Plaintiff-Appellant Cross-Appellee,
v.
M/V POLLUX, etc., Defendant-Appellee Cross-Appellant,
Negocios del Mar, S. A., Defendant-Third-Party
Plaintiff-Appellee Cross-Appellant.
EMPAC GRAIN CO., etc., Defendant-Appellee Cross-Appellant,
v.
A SHIPMENT OF WHEAT OF 19,067.949 METRIC TONS PRESENTLY
ONBOARD the M/V POLLUX, in rem, Third-Party
Defendant-Appellee.
 No. 79-2507.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 10, 1979.
 
 Michael D. Sydow, Houston, Tex., for plaintiff-appellant cross-appellee.
 E. D. Vickery, Kenneth D. Kuykendall, Houston, Tex., for Negocios del Mar.
 John R. Pearson, Houston, Tex., for Empac Grain Co.
 Appeals from the United States District Court for the Southern District of Texas.
 Before WISDOM, CLARK and GEE, Circuit Judges.
 GEE, Circuit Judge:
 
 
 1
 The facts of this unfortunate case present a maritime version of the eternal triangle, one in which the difficulties arising between each of the three (or perhaps four or five) actors transcend their relationship to bedevil the others.
 
 
 2
 Plaintiff Goodpasture, Inc. is a Texas corporation that deals in wheat. Defendant M/V POLLUX, an oceangoing vessel engaged in commerce upon navigable waters of the United States, is owned by defendant Negocios del Mar, a foreign corporation. Negocios del Mar has no offices or permanent officials in the United States, no property there except the M/V POLLUX, and no employees in this jurisdiction other than the complement of the POLLUX.
 
 
 3
 Early this year Goodpasture contracted to sell a large quantity of wheat to Empac Grain Corporation, Inc. Under the terms of that sale, Empac was to set up in a major stateside bank an irrevocable letter of credit payable to Goodpasture for an amount sufficient to cover this wheat. The bank was to be instructed to pay Goodpasture upon presentation of various documents, one a bill of lading. After this original contract had been reached but before any performance by either side, Empac requested that the contract be renegotiated to permit, rather than a letter of credit in favor of Goodpasture, an assignment by Empac to Goodpasture of a portion of the letter of credit set up for Empac by its customer Idema, a Colombian entity. Payment under the Idema-Empac letter of credit was to be made against documents, including a freight prepaid bill of lading.
 
 
 4
 Shortly thereafter, such a new contract was agreed on between Empac and Goodpasture. The quantity and price terms remained the same, but the payment terms of the new contract provided for an irrevocable assignment to Goodpasture of so much of the Idema-Empac letter of credit as would be necessary to pay for the grain. For its part, Empac agreed to issue Goodpasture freight prepaid bills of lading upon the completion of loading. These bills would show Empac as the shipper, but Goodpasture would be entitled to possession of them until Goodpasture was paid under the Idema-Empac letter of credit. Under the terms of the sale, the grain was to be stowed and trimmed by Empac, a type of contract known in trade usage as an "ex spout" sale.
 
 
 5
 Under a further trade custom and usage, title to such grain does not pass until payment is made. Both Goodpasture and Empac were aware of this custom and usage in the grain trade, and each negotiated this contract pursuant to that custom and usage, which forms a part of and is a term of the contract between the parties. Both parties, therefore, understood that title to the grain was not to pass from Goodpasture to Empac until payment was made under the Idema-Empac letter of credit.
 
 
 6
 After the original sales contract but before its renegotiation, Empac entered a time charter party with Negocios del Mar for M/V POLLUX to carry this grain from Houston to Colombia. Clause 35 of the Empac-Negocios charter party reads, "master will authorize charterers or their agents to sign bills of lading in his behalf, but bills of lading to be in accordance with mates and tally clerks receipts." The charter party further provided that the vessel was to be delivered on or before March 30, 1979. Charter hire was payable at a daily rate beginning on the date the vessel was delivered at Houston, the first 24 days hire to be paid in advance by Empac. Empac assured Goodpasture that Empac was authorized by Negocios to sign freight prepaid bills of lading on behalf of the master. Receipt of this authority from Negocios was confirmed by Empac's Houston agent.
 
 
 7
 The vessel arrived at Houston about a week late, when Negocios tendered the vessel to Empac and demanded prepayment of the first 40 days charter hire. Between April 6 and April 11, 1979, Negocios repeatedly demanded payment of the charter hire. On April 11, 1979, Empac assured Negocios that the money had been transferred. On the basis of this assurance, Negocios did not withdraw the ship from the charter and permitted it to be loaded. When loading was completed, Goodpasture, in accordance with Empac's instructions, prepared a freight prepaid bill of lading showing the quantity of grain loaded and its condition in accordance with the mate's and tally clerk's receipts.
 
 
 8
 About 45 minutes after loading of M/V POLLUX was completed, Negocios notified Empac that Empac's authority to issue bills of lading was revoked and that only Negocios' agent or the master of the POLLUX could issue them. This was done in pursuance of the shipowner's plan to withhold issuance of such bills of lading until charter hire for the proposed voyage, plus the costs of bunkers, was paid in advance. The next day, Negocios informed Goodpasture that it would not issue freight prepaid bills of lading until it received payment in full for the proposed voyage, plus bunkers, port charges, and costs for passing the Panama Canal, suggesting that Goodpasture advance these funds. Goodpasture declined on the ground that it was not obliged to finance Negocios or Empac under either law or charter party. Goodpasture then filed this suit for conversion against M/V POLLUX, Negocios and Empac to prevent the POLLUX from sailing from Houston with Goodpasture's grain, causing the United States Marshal to seize the POLLUX on the same day. The vessel still remains under seizure. Goodpasture claimed that it was entitled either to the execution of "freight prepaid" bills of lading, the return of its cargo, or a security bond in the amount of $3,500,000. The vessel owner refused to execute such "freight prepaid" bills of lading and contended that Goodpasture was not the proper party to receive the bills of lading. The bills of lading show that the shipper of the cargo was Empac, and the vessel owner at all times stood willing to provide the executed "freight prepaid" bills of lading to Empac if Empac would pay freight and bunkers in accordance with its charter party. Empac, Negocios and Goodpasture explored various possibilities for resolving the dispute in such a way as to effect the grain sale and avoid the expense associated with unloading the POLLUX.
 
 
 9
 On April 25, Goodpasture made the first written demand upon Negocios to return the grain to Goodpasture. After considerable delay and after extensive negotiations with the bank issuing the Idema-Empac letter of credit and with Idema, it became apparent that no payment would be made either to Goodpasture or to Negocios under that letter. Negocios then withdrew from the charter party. Thereafter, Negocios filed a claim of owner to the POLLUX, asserted certain counterclaims against Goodpasture, and filed a third-party complaint against the grain on board the POLLUX. At the same time, Negocios requested that the court order the grain sold. Goodpasture filed a claim of owner to the grain and an answer to the third-party complaint and counterclaim. Goodpasture then posted security in the amount and form required by Negocios. Goodpasture reserved its right to have the court determine necessity for and amount of security to be required for Negocios' claims, and Negocios agreed that the court should make those determinations. On June 5, 1979, the court ordered that the grain be discharged into the custody of Goodpasture.
 
 
 10
 Having found the above facts,[1] the district court concluded that Negocios' refusal to sign freight prepaid bills of lading did not constitute conversion of Goodpasture's wheat, that Negocios was under no statutory or contractual obligation to issue bills of lading in any form to Goodpasture, and that Goodpasture had no In rem right against the vessel. It therefore ordered the seizure of the M/V POLLUX lifted, released the POLLUX from arrest, and dismissed Goodpasture's suit against POLLUX. A stay of this order, certification, and this expedited appeal followed. We reverse.
 
 
 11
 The question on this appeal, once seen, is simple and narrow: did the ship have a claim against Goodpasture to support the maritime lien it asserted against the ship's cargo of Goodpasture's wheat? From the answer to this inquiry all else follows, since if Negocios and POLLUX had no claim, they had no lien; and if they had no lien, their assertion of a possessory right in Goodpasture's grain and their refusal either to carry or to release it was wrongful. And if wrongful, then Goodpasture had a claim against the vessel, justifying the suit and attendant seizure of it. We conclude that the POLLUX had no claim against Goodpasture; hence our judgment.
 
 
 12
 The shipowner's rights under the time charter ran against Empac, which had "rented" the ship by the day for the cruise to Colombia. We assume, Arguendo, that Empac was in arrears under this charter and that had the wheat been Empac's, the ship and its owner, Negocios, would have had a claim upon it. The trial court found, however, that title to the grain never passed from Goodpasture to Empac because Empac never paid Goodpasture for it. Goodpasture had no contract with Negocios, only with Empac; did not care whether the wheat was carried to Colombia, to Timbuktu, or was consumed on board by mice so long as it was paid for it; and owed no duties to the ship or Negocios except those exacted of all by the law in general.[2] In particular, whatever rights to payment for use of the POLLUX Negocios may have had against Empac, the charterer, did not run against Goodpasture or its wheat.
 
 
 13
 It remains to consider whether the seizure of Goodpasture's wheat by Negocios as security for its claims against Empac was a maritime tort giving rise to an In rem claim in Goodpasture against the POLLUX. The LYDIA, 1 F.2d 18 (2d Cir. 1924), carries us most of the way to our destination. There British & Foreign Agencies, Ltd. chartered M/V LYDIA to load and transport coal contracted for with McKenzie Company. As in our case, all contractual rights and duties in this triangle passed through British & Foreign (buyer), McKenzie (seller) and the shipowner having none between themselves. A dispute under the charter having arisen, LYDIA nevertheless loaded McKenzie's coal, asserted a charter-party lien against it, and sailed away. Our brothers of the Second Circuit found that in these circumstances a maritime tort of conversion, giving rise to In rem suit against the LYDIA, had occurred. We agree.
 
 
 14
 Our situation here is less aggravated, for POLLUX did not sail but merely asserted a claim in the nature of a maritime lien against the wheat. That claim was asserted with the intent to hold the wheat hostage against Empac's time charter arrears, and the record is undisputed that Negocios had no intention of releasing the wheat to Goodpasture or anyone else until the charter hire was paid. Here was no puffery or negotiating bluff but a real and manifested claim on the wheat by one in actual possession of it at clear variance with the rights of its owner, one which has been manfully maintained to this day. Goodpasture, indeed, only obtained discharge of the wheat by posting the very substantial security demanded by Negocios. We think these actions by Negocios were sufficiently at variance with the right to possession of the wheat by its owner, Goodpasture, to constitute conversion, which we have defined in a landside context as "the unlawful and wrongful exercise of dominion, ownership or control over the property of another, to the exclusion of the same rights by the owner." Bankers Life Insurance Co. v. Scurlock Oil Co., 447 F.2d 997, 1004 (5th Cir. 1971). See also Norris v. Bovina, 492 F.2d 502 (5th Cir. 1974). In accordance with our prior order of August 2, 1979, the cause is
 
 
 15
 REVERSED AND REMANDED.
 
 
 
 [1]
 Our statement of facts is a paraphrase of the court's findings
 
 
 [2]
 And since there was no contract between Negocios and Goodpasture, even had Goodpasture had an interest in POLLUX' carrying the wheat cargo somewhere, there was no agreement between them to alter the settled principle of American maritime law that "freight is not earned unless and until the goods are delivered to their destination." United States v. Waterman S.S. Corp., 397 F.2d 577, 578 (5th Cir. 1968). The POLLUX never left the loading dock