530 F.Supp. 1074 (1981)
KOCH FUELS, INC., Plaintiff,
v.
CARGO OF 13,000 BARRELS OF NO. 2 FUEL OIL, More or Less, In Rem, and Inland Oil & Transport Company, Defendants.
No. 80-353A(4).
United States District Court, E. D. Missouri, E. D.
December 30, 1981.
*1075 *1076 John S. Sandberg and Peter Von Gontard, Shepherd, Sandberg & Phoenix, St. Louis, Mo., for plaintiff.
Joseph P. Conran and Harry B. Wilson, St. Louis, Mo., for defendants.

MEMORANDUM
HUNGATE, District Judge.
This matter is before the Court for a decision on the merits of the claim of plaintiff Koch Fuels, Inc., (Koch Fuels) against Inland Oil & Transport Company (Inland). Koch Fuels claims ownership and the right to possession of a certain cargo of fuel oil loaded onto one of Inland's barges, and damages for tortious conversion of the oil by Inland. Inland asserts various defenses.
The Court held a nonjury trial in this cause on September 1, 1981, allowing the parties a full opportunity to present evidence.
The parties stipulated that the Court can consider all of the testimony and exhibits previously received in the jury trial on Inland's counterclaim against Koch Industries, Inc., subject to all previous objections.
Having considered the pleadings, trial testimony, exhibits, stipulations, and memoranda of the parties, and being fully advised in the premises, the Court hereby makes and enters the following findings of fact and conclusions of law.

Findings of Fact
1. Plaintiff Koch Fuels, Inc., is a corporation duly organized according to law at all times in question.
2. Defendant Inland Oil & Transport Company, a barge line, is a corporation duly organized according to the laws of the State of Missouri at all times in question.
3. Koch Industries, Inc., (Koch Industries) is a corporation duly organized according to the laws of the State of Kansas at all times in question.
4. Koch Fuels is a wholly-owned subsidiary of Koch Industries.
5. Late in the afternoon of February 26, 1980, Roger Elliott of the barge transportation department of Koch Industries contacted Jane Novak of Inland about moving a shipment of oil from Union Oil Company in LeMont, Illinois, to a terminal operated by Koch Fuels in the Chicago, Illinois, area. Koch Industries was moving the oil on behalf of its subsidiary, Koch Fuels.
6. Ms. Novak indicated that she did have a barge available that was capable of carrying the oil. It was barge IOT-114 (the barge). A tentative agreement was made between Roger Elliott and Jane Novak. *1077 The agreed upon terms were that Koch Industries would use the barge for three days for $800.00 per day, payable upon receipt of invoice. Novak also mentioned that there would be some additional terms relating to insurance and indemnity, but she indicated that she would spell that out in a telex message to Mr. Elliott. She, therefore, sent a telex which Roger Elliott received late that afternoon. Mr. Elliott then talked with his boss, Richard Mayer, about the terms of the telex. Mr. Mayer indicated that the language waiving the warranty of seaworthiness on the barge and holding Inland harmless for anything that could possibly go wrong was unacceptable and that Mr. Elliott should talk with Dick Shisler of Koch Industries' insurance department to work out suitable language. Mr. Elliott did this and he and Mr. Shisler attempted to call Novak, but she had already left for the day. Mr. Elliott did not anticipate any insuperable problems in working out mutually acceptable terms for charter of the barge.
7. The telex sent by Ms. Novak also asked Koch Industries to acknowledge acceptance of the charter by return telex. Koch Industries did not send any acknowledgement.
8. The LeMont refinery of Union Oil Company, after being informed that Inland would supply the barge, contacted Jane Novak. Russ Anderson of Union Oil talked with Ms. Novak and obtained information on how they were to load the barge. Later, Novak called Anderson back and asked if he could suggest a barge company who could move the barge. Anderson suggested Ham-Tug & Fleeting, among other companies. Novak contacted Ham-Tug and asked them to call Union about delivering the barge from the LeMont shipyard to the Union Oil refinery. This movement was made by Ham-Tug without the knowledge of Koch Industries.
9. Barge IOT-114 was delivered to the Union Oil refinery on the morning of February 27, 1980. Loading began at approximately 7:40 a.m. The personnel working at the Union Oil docks were supervisory personnel, inexperienced at loading barges and measuring their contents. The normal dock crew was on strike. Sometime that morning, a pinhole leak was discovered in one of the compartments of the barge.
10. After the leak was discovered, both Novak and Elliott were advised of the problem. On several occasions, they discussed what should be done. They agreed that the oil would be pumped back to Union Oil's refinery and the barge would then be taken back to the LeMont shipyard for repairs.
11. During the attempt to pump the oil back to the refinery, the pump on the barge broke down. Elliott found out about this problem the next day, February 28, 1980. Also on the same day, February 28, Union ordered Ham-Tug to take the barge to the LeMont shipyard for repairs to the pump. As of February 29, 1980, the pump was repaired.
12. Sometime during the day of February 27, officials at the Union Oil refinery dock measured the amount of oil in the barge. The method employed was strapping, whereby a stick is placed in each compartment to measure the depth of the oil in the compartment. Knowing the size of each compartment, the approximate volume of the contents was calculated as 554,171 gallons. The record contains insufficient evidence from which the Court can infer whether this measurement was taken before or after any oil was pumped back to the refinery. Koch Industries paid Union Oil for 554,171 gallons of oil.
13. On February 28, Inland sent a telex to Koch Industries advising Koch Industries that Inland would hold Koch Industries responsible for the spill from the barge under the terms of the February 26, 1980, telex. Later that day, Koch Industries responded by telex, denying any liability arising out of the movement of the barge, stating that Koch Industries never accepted Inland's offer of charter embodied in the February 26 telex. The telex also contained a request that Inland inform Koch Industries of the time and place of any survey by Inland so Koch Industries' surveyor could attend.
*1078 14. As of the afternoon of February 28, Elliott and Novak were interested in getting the oil off the barge.
15. On February 29, Koch Industries sent a telegram to Inland stating that due to the circumstances, shipment of the oil would not occur.
16. On the morning of March 1, Novak received a call from Ham-Tug & Fleeting indicating that Union Oil had dock space available for the barge at their refinery. Novak's understanding was that this meant that the barge could be unloaded. Ham-Tug wanted to know what it should do with the barge. Novak told Ham-Tug not to move the barge or have it unloaded. Novak's reason for not having the barge unloaded was that Elliott had not called her. Novak, however, made no attempt to call Elliott on March 1.
17. On March 3, relations between Inland and Koch Industries deteriorated rapidly. Early that morning, Inland sent a telex to Koch Industries stating that it was Inland's position that the barge was redelivered to Inland by Koch Industries on February 29. The telex also stated that Inland accepted the redelivery, considered it an abandonment of the cargo, and would bill Koch Industries for the charter hire, barge repair, and all other liability since February 26.
18. Elliott called Novak at approximately 11:00 a.m. on March 3. Elliott had not yet received Inland's telex. Late that afternoon, Elliott called Inland again and talked with Herbert Wolkowitz, president of Inland. Elliott informed Wolkowitz that Koch Industries wanted the oil discharged.
19. That same afternoon, Koch Industries responded to Inland's telex sent that morning, stating that Koch Industries had not abandoned the oil on the barge.
20. Early in the evening of March 3, several officials of Koch Industries called Wolkowitz. The Koch Industries officials could not tell Wolkowitz who owned the oil. They also stated that Koch Industries would not indemnify Inland. Wolkowitz responded that Inland would not discharge the oil unless Koch Industries agreed to indemnify Inland and put up $60,000.00 as security for Inland's losses. The Koch Industries officials refused to meet Wolkowitz's demands. It was Koch Industries' position that liability for expenses could be discussed once the oil was returned.
21. Koch Industries attempted to get the oil discharged on March 4, but failed because Inland had instructed Union Oil not to discharge it.
22. On March 2, an independent inspector hired by Inland inspected the barge and determined that it contained approximately 515,662 gallons of no. 2 fuel oil.
23. On March 4 or 5, Inland had the barge picked up and towed south. The barge was still loaded with the oil.
24. Also on March 4, Inland sent a telegram to Koch Industries, stating that Inland considered the barge redelivered and the oil abandoned. The telegram also stated that "[w]e will store the cargo at your cost and for your account, until the issues are resolved," and reiterated Inland's demand that Koch Industries indemnify Inland for all losses resulting from the charter of the barge.
25. On March 5, 1980, Koch Industries again sent a written demand for return of the oil. Inland's response was another telegram demanding documentation of ownership of the oil and the barge, and stating that Inland's position remained unchanged.
26. The oil ended up in storage at a terminal in St. Louis, Missouri.
27. On March 13, 1980, Koch Industries initiated this litigation by filing a verified in rem complaint, stating that Koch Industries was the owner of the cargo of 13,000 barrels of no. 2 fuel oil that was named as the defendant.
28. On March 14, 1980, Inland intervened as a defendant and filed its answer, claim to the cargo, and counterclaims.
29. On March 21, 1980, the Court, after a probable cause hearing, allowed the arrest of the cargo by Koch Industries. The Court required Koch Industries to post a $75,000.00 bond to guarantee payment of any *1079 damages suffered by Inland and any damages resulting from an improper arrest of the cargo. The Court ordered the fuel to be delivered to Koch Industries.
30. Koch Industries posted the bond on March 21, 1980, and picked up the oil on March 26, 1980. Inland delivered 512,719 gallons of oil to Koch Industries.
31. On March 20, 1980, Koch Industries moved the Court for leave to amend its claim by adding Koch Fuels, Inc., as a party plaintiff. Koch Fuels claims ownership of the oil.
32. Inland then moved for summary judgment against the claims of Koch Industries because deposition testimony had established that Koch Industries never owned the oil in question. On April 28, 1981, the Court entered summary judgment against the claims of Koch Industries.
33. After a jury trial on Inland's counterclaims against Koch Industries, a jury returned a verdict of $35,000.00 in favor of Inland and against Koch Industries. The Court accordingly entered judgment for that amount.
34. The Court finds that there is a maritime industry custom and standard whereby variations of one-half of one percent in the quantity of liquid cargo, such as no. 2 fuel oil, are disregarded. Therefore, the Court finds that the difference between the 515,662 gallons measured on the barge on March 2, and the 512,719 gallons delivered to Koch Industries in March 26, 1980, is not significant.
35. Koch Fuels presented evidence on the market value of truckload lots of oil in Chicago, Illinois, based on Platt's Oilgram, a standard oil industry publication. No. 2 diesel fuel oil sold in Chicago had an average price of 81.55 cents per gallon on February 29, 1980, the date Koch Fuels claims Inland wrongfully converted the oil in question. The average Chicago price for truckload lots on March 26, 1980, the date Koch Industries took possession of the oil, was 79.22 cents.
36. The only evidence on the value of barge lots of fuel sold in Chicago was a purchase of oil by Koch Fuels on February 29, 1980, for 77 cents per gallon.
37. Koch Fuels presents the following evidence on incidental expenses:
a. $131.00  invoice from St. Louis Testing Laboratories, Inc., to Coke Refining for chemical testing of the oil when it was in St. Louis.
b. $3,250.00  invoice from Marine Transportation Company, Inc., to Koch Refining Company for towing the oil from St. Louis to Hartford, Illinois.
c. $457.50  invoice from Marine Transportation Company, Inc., to Koch Refining Company for demurrage on the shipment of the oil from St. Louis to Hartford, Illinois.
The Court finds that the testimony at trial established that Koch Fuels is ultimately responsible for the above expenses.
38. Koch Fuels presented evidence on prime interest rates and calculations of prejudgment interest. Koch Fuels' witness, however, was not properly qualified as an expert. The evidence on interest rates consisted of a list of the prime rates charged by Mercantile Trust Company for various dates between December of 1979 and September of 1981. The list was received over objection of Inland. The calculations performed by Koch Fuels' witness, however, were not admitted into evidence.

Conclusions of Law
1. This Court has jurisdiction over this cause pursuant to Rule 9(h) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1333.
2. Defendant Inland claims that this Court has no jurisdiction to enter any order in favor of Koch Fuels because Koch Fuels, as plaintiff, has not complied with Rule C(2) of the Supplemental Rules for Admiralty & Maritime Claims which requires the filing of a verified complaint. In support of its claim, Inland notes that the Court granted leave to Koch Industries to amend its complaint by adding Koch Fuels as a party plaintiff, but Koch Industries never filed a verified amended complaint on behalf of Koch Fuels.
*1080 3. Inland's jurisdictional argument is misplaced. The practical effect of the Court's leave to amend was simply to allow Koch Fuels to proceed in place of Koch Industries as the alleged owner of the oil. The verified amended complaint of Koch Industries is construed by the Court to state the claims of Koch Fuels as if it was amended by interlineation.
4. The Court concludes that it has jurisdiction to enter an order in favor of Koch Fuels.
5. Koch Fuels bases its cause of action on a wrongful conversion theory. Inland's defenses are that Koch Fuels failed to prove ownership of the oil and failed to prove conversion by Inland.
6. A federal court sitting in admiralty generally applies the federal statutory and common law of admiralty. St. Hilaire Moye v. Henderson, 496 F.2d 973, 980-81 (8th Cir.), cert. denied 419 U.S. 884, 95 S.Ct. 151, 42 L.Ed.2d 125 (1974). The court, however, may apply state law when it "does not contravene any acts of Congress, nor work any prejudice to the characteristic features of the maritime law, nor interfere with its proper harmony and uniformity in its international and interstate relations." Just v. Chambers, 312 U.S. 383, 389, 61 S.Ct. 687, 692, 85 L.Ed. 903 (1941); St. Hilaire Moye v. Henderson, supra. The application of state law for conversion of the oil in this case would not interfere with the uniformity or characteristic features of admiralty and maritime law. Therefore, the Court concludes that the Illinois law of conversion, the state where the alleged conversion occurred, is relevant to this cause of action.
7. A cause of action for conversion is established when a party shows the following:
(1) an unauthorized and wrongful assumption of control, dominion, or ownership by a person over the personalty of another;
(2) his right to the property;
(3) his right to the immediate possession of the property, absolute and unconditional; and
(4) a demand for possession thereof.
Farns Associates, Inc. v. Sternback, 77 Ill. App.3d 249, 32 Ill.Dec. 722, 725, 395 N.E.2d 1103, 1106 (1979); Dickson v. Riebling, 30 Ill.App.3d 695, 333 N.E.2d 646 (1975).
8. The above elements for conversion have been applied in admiralty cases. Where no lien exists or where the circumstances show an "unlawful and wrongful exercise of dominion, ownership or control over the property of another, to the exclusion of the same by the owner," a maritime tort in conversion arises. Goodpasture, Inc. v. M/V Pollux, 602 F.2d 84, 87, reh. denied, 606 F.2d 321 (5th Cir. 1979), citing Bankers Life Insurance Co. v. Scurlock Oil Co., 447 F.2d 997, 1004 (5th Cir. 1971); The Lydia, 1 F.2d 18 (2d Cir.), cert. denied, 266 U.S. 616, 45 S.Ct. 97, 69 L.Ed. 470 (1924).
9. Inland asserts that Koch Fuels failed to establish any of the elements necessary for conversion.
10. There is no question that Inland asserted control over the oil on February 29, 1980. See findings of fact no. 17. The issues raised, then, are whether Koch Fuels had the right to immediate possession of the oil on February 29, and if so, whether Inland had any rights to the oil such that Inland's assumption of control and dominion over the oil was not wrongful. Inland's right to the oil is primarily a question of whether Inland had a maritime lien on the oil.
11. The Court finds that Koch Fuels had a right to possession and a right to ownership of the oil. Whether Inland had a superseding lien will be considered later. Employees of Koch Industries testified that the movement of oil by Koch Industries was on behalf of Koch Fuels. Koch Fuels operated the terminal where the oil was supposed to go. Therefore, Koch Industries was, in effect, acting as the agent for its subsidiary, Koch Fuels.
12. The next question is whether Inland had a right to possession of the oil as of February 29, 1980.
*1081 13. Inland claims that it had a right to possession of the oil because Koch Industries redelivered the barge on February 29, that Koch Industries abandoned the oil, that Inland did not know the owner of the oil, and that Inland had a right to hold the oil pending payment of the charter fee and assumption of liability for the costs incurred by Inland in connection with the charter of the barge.
14. Generally, maritime law permits an action in rem against the cargo itself for breach of a contract to pay freight. Benedict On Admiralty, vol. 2, § 42 (1981). Usually, the ship has accepted a cargo pursuant to a bill of lading, which requires payment before delivery and grants the shipowner a lien for the services provided under the bill of lading. E.g., Goodpasture, Inc. v. M/V Pollux, supra.
15. Here, however, the contract was a bareboat charter, not a contract for the carriage of goods. One of the terms of the charter proposed by Inland was that the charter rate was payable upon receipt of invoice. Therefore, the Court concludes that Inland did not expect to receive payment until it sent an invoice to Koch Industries. This constitutes a waiver of Inland's right to a lien for the charter rate. See Benedict On Admiralty, supra at § 61; The Eddy, 5 Wall. 481, 493-94, 72 U.S. 481, 493-94, 18 L.Ed. 486 (1867); Iran Express Lines v. Sumatrop, 563 F.2d 648, 650-51 (4th Cir. 1977).
16. Inland's assertion of a right to the oil as security for Inland's costs in connection with the difficulties with the barge after February 26 presents more difficult problems.
17. The Court has not found any authority that would give Inland a right to assume control over the oil on the barge on February 29. Usually, a lien on cargo for freight or demurrage is a possessory lien that continues so long as possession is maintained by the owner. E.g., Beverly Hills Nat. Bank & Trust Co. v. Compania De Navegacione Almirante S. A., 437 F.2d 301, 304 (9th Cir.), cert. denied, 402 U.S. 996, 91 S.Ct. 2173, 29 L.Ed.2d 161 (1971). In this case, Inland took possession of the oil on February 29; Inland was not just maintaining possession. Thereafter, Inland refused to unload the cargo in an attempt to impose certain conditions upon Koch Industries.
18. The Court concludes that Inland had no right to a lien against the oil. Inland, therefore, wrongfully assumed control over the oil, moving it to St. Louis, Missouri, and not informing Koch Industries of its whereabouts until March 10 or 11, 1980.
19. Inland also claims that it had a right to possession because it did not know the owner of the oil. Inland refers the Court to no authority that gives Inland a right to possession because it does not know who owns the oil. Inland knew that it did not own the oil. The Court believes that Inland should have unloaded the oil as soon as possible and pursued whatever remedies it had against Koch Industries on Inland's liability claims.
20. Inland asserts that it is not liable for conversion because Koch Fuels never demanded possession. While generally a demand for possession must be made by the person entitled to possession, it may be made by an agent of the owner. See generally 18 Am.Jur.2d, Conversion § 65. Here, Koch Industries demanded possession on behalf of its subsidiary, Koch Fuels.
21. The Court concludes that Inland wrongfully converted the oil on February 29, 1980.
22. Koch Fuels is claiming as damages the fair market value of a portion of the oil that was not returned by Inland, for the difference in fair market value of the oil returned from the date it was taken until the date it was returned, and the incidental expenses involved in receiving the oil after the Court ordered it returned.
23. The measure of damages for conversion is the fair market value of the item at the time and place of conversion, plus interest from that time. First Nat. Bank v. York, 27 Ill.App.3d 614, 327 N.E.2d 400 (1975); Williams v. Board of Education, 52 Ill.App.3d 328, 10 Ill.Dec. 161, *1082 367 N.E.2d 549 (1977). In addition, for property returned after conversion, the measure of damages is the depreciation in value of the item converted between the date of the conversion and the date of return. Weiland Tool & Mfg. Co. v. Whitney, 100 Ill.App.2d 116, 241 N.E.2d 533 (Ill.App. 1968), rev'd on other grounds, 44 Ill.2d 105, 251 N.E.2d 242 (1969).
24. The only measurement of the amount of oil before March 2, 1980, was Union Oil's measurement of 554,171 gallons. The amount of oil delivered to Koch Industries on March 26, 1980, was 512,719 gallons, a difference of 41,452 gallons.
25. While it is not clear from the record whether Union Oil's measurement was before or after oil was pumped back to Union Oil's refinery, the Court concludes that Inland is estopped from claiming any inaccuracy because it took possession of the oil, thereby preventing any further measurement by Koch Industries. It should be noted that on February 26, 1980, Koch Industries requested Inland to inform Koch Industries of the time and place of any survey so that Koch Industries' surveyor could attend. The record does not indicate that Inland responded to the requests.
26. A general rule on estoppel, applicable in this case, is as follows:
If a party's conduct has reasonably induced another to follow a course of action that otherwise would not have been followed and it turns out to be the latter's detriment, an estoppel will arise to prevent injustice.
Peters v. United Van Lines, Inc., 82 Ill. App.3d 104, 37 Ill.Dec. 488, 493, 402 N.E.2d 378, 383 (1980). Because of Inland's actions, Koch Industries was not able to dispute Union's measurement and Koch Industries relied upon it and paid Union Oil for 554,171 gallons of oil. See Stewart v. O'Bryan, 50 Ill.App.3d 108, 8 Ill.Dec. 633, 365 N.E.2d 1019 (1977).
27. Therefore, Koch Industries is entitled to the fair market value of 41,452 gallons of oil.
28. Koch Fuels presented evidence on the value of truck lots of no. 2 oil sold in Chicago, Illinois, on February 29, 1980, and March 26, 1980. The oil in question, however, was not in truck lots. The ultimate market for Koch Fuels' oil is not the appropriate measure of damages. The oil loaded onto the barge was not sold at truck lot rates.
29. The only evidence presented at trial on the price of barge lots of oil was a purchase of no. 2 oil by Koch Fuels on February 29, 1980, for 77 cents per gallon. Lacking any better measure, the Court concludes that the value of the 41,452 gallons is 77 cents per gallon, for a total of $31,918.04.
30. Since the Court does not accept the evidence on truck lots as a reasonable indicator of barge lot prices, there is no evidence on the difference in value of the oil returned to Koch Industries on March 26, 1980, and the oil converted by Inland on February 29, 1980. Therefore, the Court cannot award Koch Fuels any damages for depreciation in the value of the oil while it was in the possession of Inland.
31. The Court concludes that Koch Fuels is entitled to receive as part of the judgment against Inland the $3,838.50 of expenses set forth in paragraph 37 of the findings of fact in this cause as incidental expenses involved in receiving the oil from storage in St. Louis.
32. The Court concludes that Koch Fuels is entitled to prejudgment interest on the damage award. "[P]rejudgment interest is permitted in the discretion of the trial court and `should be granted unless there are exceptional or peculiar circumstances.'" Federal Barge Lines, Inc. v. Republic Marine, Inc., 616 F.2d 372, 373 (8th Cir. 1980), citing United States v. M/V Gopher State, 614 F.2d 1186, 1190 (8th Cir. 1980). Prejudgment interest is computed from the time of the event giving rise to damages, in order to fully compensate for the injured party's losses. Id. The rate of interest in admiralty is the prevailing interest rate at the time of trial. Id.
*1083 33. No unusual or exceptional circumstances exist to prevent the recovery of prejudgment interest.
34. At trial, Koch Fuels presented evidence on interest rates (see findings of fact no. 38). The Court concludes that the evidence presented does not establish the prevailing interest rate at the time of trial. The Court will not accept the list of interest rates offered without sponsorship by a qualified expert.
35. The Court, not having sufficient evidence upon which it can determine the prevailing interest rate at the time of trial, concludes that it must hold a hearing to take evidence on an appropriate prejudgment interest rate. The hearing will be held on Thursday, January 14, 1982, at 9:30 a. m.
36. Koch Fuels also requests punitive damages in this case. In St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 412 F.Supp. 45 (E.D.Mo. 1976), rev'd on other grounds, 562 F.2d 1040 (8th Cir. 1977), cert. denied, 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978), it was held that:
Punitive damages, which are awarded by way of punishment to deter defendants from future similar acts of misconduct, are recoverable in Missouri where defendant's tortious conduct was willful, wanton, malicious, or so reckless as to be in utter disregard of the consequences.
412 F.Supp. at 61. See also Northern v. McGraw-Edison Co., 542 F.2d 1336 (8th Cir. 1976), cert. denied, 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 reh. denied, 430 U.S. 960 (1977). The same rule applies under Illinois law. Munson v. American Nat. Bank & Trust Co., 484 F.2d 620 (7th Cir. 1973).
37. After careful consideration of the entire record, the Court concludes that Inland's acts are not sufficiently willful, wanton, malicious, or reckless to warrant an award of punitive damages in this case. Koch Fuels' request for punitive damages will be denied.