**PROZINA SHIPPING CO., LTD., Plaintiff,**

v.

**THIRTY–FOUR AUTOMOBILES and their contents, in rem, and Elizabeth–Newark Shipping, Inc., in personam, Defendants.**

**Civ.A. No. 97–11770–NG.**

United States District Court, D. Massachusetts.

Jan. 22, 1998.

Thomas J. Muzyka, Clinton & Muzyka, Norman A. Peloquin, II, Flanagan & Hunter, Boston, MA, Robert J. Plansker, Clark, Archeson & Reisert, New York City, for Prozina Shipping Company Limited.

Lawrence J. Mullen, Wadland & Associates, Timothy R. McHugh, Hoch & McHugh, Boston, MA, for Thirty–Four Automobiles and their contents, Elizabeth–Newark Shipping Inc., Lermond Metellus, Jean Remus Jean, Natacha Alexandre, Mirelle Jeremie, Osnold Deguerre, Maryse Narcisse, Tunis Lexon, Richard Merlande, Justin Plaisival, Vena Tilius, Hubert St. Paul, Jean R. Michel, Charles Pidoux, Rosa Franck, Janvier Jowel, Altagrace Metayer, Pierre Andre Richard, Marie Fermin, aka Mme. Monlouis, Jean Orne, Jean Marc Pierre, Wilson Jean Baptiste, Jean Casy, Leres Prevot, Frantz Merthil, Renaud Charles, Dieudonne Dominique, and Tony Valbrun.

Norman A. Peloquin, II, Flanagan & Hunter, Boston, MA, Robert J. Plansker, Clark, Archeson & Reisert, New York City, for Prozina Shipping Company Limited.

## MEMORANDUM AND ORDER

GERTNER, District Judge.

### I. BACKGROUND

This dispute involves the possession of thirty-four automobiles, arrested by order of this Court, without their owners' knowledge, as security in a dispute in which the owners are not involved.

In August 1997, plaintiff Prozina Shipping Co., Ltd. ("Prozina") filed a motion before this Court for the maritime arrest of thirty-four vehicles which it had in its possession following the collapse of a contract Prozina had entered into to transport the vehicles to Haiti. Prozina claimed that certain amounts were owing under a shipping charter contract between itself and a third party, Elizabeth Newark Shipping ("ENS"); Prozina asserted a maritime lien on the vehicles for these amounts.

The motion to arrest was unopposed and was granted. Now, owners of two of the vehicles, Lermond Metellus ("Metellus") and Jean Remus Jean ("Jean") (collectively "claimants") have filed verified claims to their vehicles with this Court. Metellus has moved this Court to vacate the arrest, arguing that Prozina does not have a valid maritime lien. Both claimants have counterclaimed for conversion, for penalties under the Harter Act, 46 U.S.C.App. §§ 193 and 194, for failure to issue the bills of lading, and for treble damages and attorneys fees under M.G.L. Ch. 93A. Metellus has filed a motion for counter-security for these claims. He has also brought a motion for expedited

discovery, to which Prozina has responded with a cross-motion for a protective order.

## II. FACTS

Metellus and Jean each paid Digital Shipping Company ("Digital") $1,000 to ship a used car to Haiti. They delivered the vehicles and their titles to a Digital agent at State Pier in Fall River, Massachusetts in April, 1997. Digital had arranged to ship seventy-eight cars to Haiti through ENS, a charter company. ENS, in turn, had entered into a one-year time charter agreement with the plaintiff, Prozina, to charter its ship, the M/V JEANIE BROWN.

Shortly before the seventy-eight cars were to be loaded on board the JEANIE BROWN for shipment to Haiti, a dispute arose between Prozina and ENS. ENS allegedly failed to pay an installment of the charter hire due on May 8, 1997. In response, Prozina instructed ENS' subagent not to issue bills of lading for the cars. Prozina then proceeded to load the seventy-eight cars on board the JEANIE BROWN. Still not having been paid the charter hire, on May 15, Prozina withdrew the ship from charter. It kept the cars aboard the ship, however, because the pier allegedly would not allow it to offload them. Digital then negotiated with Prozina directly, in an attempt to come to alternate terms for the cars to be shipped to Haiti. Following the collapse of those negotiations, Prozina asserted a maritime lien on the cars, based on both general principles of maritime law and Clause 18 of the charter party contract with ENS. Clause 18 reads as follows:

> That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter . . .

Prozina argues that this clause gives it a right to place a lien on the cargo, as well as a lien on the subfreights [1] owed by the cargo owners to ENS or Digital, which can be satisfied through a lien on the cargo.

In June, the seventy-eight cars were offloaded from the ship. They were stored at the Fall River Pier under a contract between

Prozina and the pier. Forty-four of the cars were later shipped to Haiti without Prozina's consent; Prozina had the rest of the cars towed to another storage facility in Fall River, where they remain.

By August, Prozina alleges, ENS had still not agreed to arbitration of their dispute over the breach of the charter party, as required by the terms of their contract. The car owners allege that at this time they were still actively communicating with Digital in an attempt to either recover their cars or ship them to Haiti. Prozina alleges in turn that by late summer it had not heard from the vehicle owners for two months. Faced with mounting storage expenses, it filed a motion in this Court for the arrest of the remaining thirty-four vehicles. That motion, which was unopposed, was granted on August 20, 1997.

The underlying dispute between Prozina and ENS is currently the subject of an arbitration proceeding in New York. However, Prozina continues to assert a lien on the cars for the unpaid charter hire and the subfreights. It has also incurred considerable expense in offloading, towage, and storage costs for the cars, for which it seeks reimbursement.

## III. THE MOTION TO VACATE THE ARREST OF THE VEHICLES

■ Under Rule(E)(4)(f) of the Supplemental Rules for Certain Admiralty and Maritime Claims, Prozina has the burden of proof to show cause why the arrest of the thirty-four vehicles should not be vacated. Fed.R.Civ.P. Supp.R. E(4)(f). Prozina argues that there is a broad rule of maritime law, allowing a charterer to assert a lien on cargo for amounts due under a contract of charter party, regardless of whether the owner of the cargo is a party to that contract. As evidence of this rule, it offers an 1866 Supreme Court case, *The Bird of Paradise*, 5 Wall. 545, 72 U.S. 545, 18 L.Ed. 662 (1866). In that case, the Court remarked that the general rule of maritime law, implied in char-

---

**1.** "Subfreights" is the maritime term for the money paid or owed by any third party to the charterer: in this case, the money paid by the car owners to Digital, which Digital should have paid to ENS.

ter contracts in the absence of language to the contrary, is that "Ship-owners, unquestionably, . . . have a lien upon the cargo for the freight, and consequently may retain the goods after the arrival of the ship at the port of destination until the payment is made." *Id.* at 554.

There is a crucial difference, however, between *The Bird of Paradise* and this case. In *The Bird of Paradise,* the owner of the cargo and the charterer of the ship were one and the same person. *Id.* at 546 ("Eccles, of Liverpool, . . . chartered the ship Bird of Paradise . . . to carry a cargo of coal, of which Eccles was the owner, to San Francisco . . . [after the coal reached San Francisco] the captain refused to deliver the cargo to the agents of Eccles"), 552 ("Charter party was signed by the claimants," described as "assignees of the charter party and of the bill of lading"). *The Bird of Paradise* thus did not involve a lien on cargo owned by third parties who were neither parties to the charter contract nor in any way responsible for its breach. Moreover, the shipowner in *The Bird of Paradise* actually carried out the charter contract; the goods were delivered to their destination.

Prozina has cited no other cases to support its claim to an automatic lien on cargo owned by third parties. In fact, the general rule— and a more modern one than the 1866 *Bird of Paradise* case—is that such a lien does not exist. In a case remarkably similar to this one, the Fifth Circuit held that where the charterer had not paid the ship owner the charter hire, the shipowner could not assert a lien on cargo not owned by the charterer. *Goodpasture, Inc. v. M/V POLLUX,* 602 F.2d 84, 86–87 (5th Cir.1979). Goodpasture, a wheat dealer, had entered into a contract to sell wheat to Empac; after the signing of the

contract between Empac and Goodpasture, but before title to the wheat had passed to Empac, Empac contracted with the owners of the POLLUX to ship the wheat to Colombia. The first forty days of charter hire were to be paid in advance. When the ship arrived in Texas, the first charter payment was overdue. Forty-five minutes after the wheat was loaded on board the ship, the shipowner revoked the charterer's authority to issue bills of lading for the cargo. It then demanded that Goodpasture—the owner of the wheat, not the charterer—pay the hire in advance, as a condition for either the issuance of bills of lading and shipment of the wheat or its release. Goodpasture instead brought suit for conversion. The Fifth Circuit held that the owner of the ship had no lien against cargo not owned by the charterer and was liable in maritime tort for "holding the wheat hostage" for payment of the charter hire.[2] *See also Drummond Coal Co. v. Interocean Shipping Co.,* 1985 WL 509, *8 (S.D.Ala.) (upholding an *in rem* claim against cargo to which the charterer held title at the time of its breach of the charter party); *The Lydia,* 1 F.2d 18 (2d.Cir.1924).

Asked at oral argument for a more recent case than *Bird of Paradise* that might arguably recognize a general right to assert a lien on cargo, regardless of its ownership, plaintiffs cited *Furness Withy (Chartering), Inc., Panama v. World Energy Systems Associates, Inc.,* 772 F.2d 802 (11th Cir.1985). *Furness Withy,* however, stands for the opposite principle. A seller of coal had contracted with two shipping companies simultaneously and then breached the first contract. The second shipping company then attached the coal. *Id.* at 805. The district court found that the attachment was ineffective because,

---

**2.** At oral argument, Prozina emphasized the one factual distinction between this case and *Goodpasture.* While the cargo owner in *Goodpasture* "did not care whether the wheat was carried to Colombia to Timbuktu, or was consumed on board by mice, so long as it was paid for it...," *Goodpasture,* 602 F.2d at 86, Claimants have a strong interest in having their cars shipped Haiti. Nonetheless, an interest in having the cars shipped to Haiti does in itself create a contract between the claimants and Prozina, a company they had never heard of before this dispute arose. As in *Goodpasture,* absent a contract between a

cargo owner and a ship owner, "there was no agreement between them to alter the settled principle of American Maritime law that "freight is not earned unless and until the goods are delivered to their destination." " *Id.* at 87 n. 2 (citing *United States v. Waterman S.S. Corp.,* 397 F.2d 577, 578 (5th Cir.1968)); *see also The Bird of Paradise,* 72 U.S. at 562 ("the settled doctrine in this country is, that freight paid in advance is not earned unless the voyage is performed . . ."). Again, as in *Goodpasture,* Prozina's ship "never left the loading dock." *Id.*

under a complex purchase and buyback financing agreement, the coal actually belonged to someone other than the breaching party. *Id.* at 808. Moreover, the parties and the court all accepted the argument that if the plaintiff had not reasonably believed that the breaching party had an ownership interest in the coal, the attachment would have been not only ineffective, but wrongful and in bad faith. *Id.*

■ Prozina also argues that it has a right to hold the cars not based on a lien on the cars themselves, but in order to protect and enforce its lien on the subfreights. Under general principles of maritime law, a lien on subfreights can be satisfied through a lien on cargo. However, for a lien on subfreights to be enforceable against a third party to the charter contract, the third party must have actual notice—normally, but not exclusively, through issuance of bills of lading—for the lien to be "perfected." *Finora Co., Inc. v. Amitie Shipping*, 54 F.3d 209, 212–13 (4th Cir.1995); *Hornbeck Offshore Operators v. Ocean Line of Bermuda*, 849 F.Supp. 434, 439 (E.D.Va.1994); *In re North Atlantic & Gulf S. S. Co.*, 204 F.Supp. 899, 904 (S.D.N.Y. 1962); *The Solhaug*, 2 F.Supp. 294, 300 (S.D.N.Y.1931) (requiring at least constructive notice, which it found by the shipper being experienced in the import business and having a copy of the charter party agreement).

■ The subfreights, moreover, must still be due to the charterer at the time the cargo owner receives notice of the shipowner's rights. If the shippers of the cargo only receive notice of the lien after they have paid the subfreights to the charterer in good faith, the lien on the subfreights is discharged. *American Steel Barge Co. v. Chesapeake & O. Coal Agency*, 115 F. 669, 676 (1st Cir. 1902), *reh'g denied*, 116 F. 857 (referring to this principle as "so well settled and so universally known that it would be a waste of words" to discuss it); *Marine Traders, Inc.*

*v. Season's Navigation Corp.*, 422 F.2d 804, 806 (2d Cir.1970); *Hornbeck*, 849 F.Supp. at 439; *Atlantic & Gulf Steamship*, 204 F.Supp. at 904 ("If the cargo is delivered and the shipper pays the subfreights to the charterer in good faith, the shipowner's lien falls").

■ Prozina failed to perfect its lien on the subfreights by timely notice to the claimants. After ENS allegedly failed to pay the charter hire that was due, Prozina first revoked ENS' authority to issue bills of lading and then refused to issue bills of lading itself. The only evidence it can offer of notice to the claimants is a letter dated May 30, 1997, from the law firm of Poles, Tublin, Patestides & Stratakis ("Poles, Tublin"), of New York, which at the time purported to be representing the car owners.[3] In this letter, Poles, Tublin referred to a different clause in the charter party than is at issue here and also reported that it had received a copy of Prozina's letter to ENS the previous day, announcing its intention to have the cars unloaded and sold at auction. From this letter, Prozina asks us to infer that Poles, Tublin had read the charter party contract in its entirety and was aware of the lien provisions that formed the basis for Prozina's planned sale.

To transform this letter from Poles, Tublin into evidence of timely notice to the claimants, Prozina makes a strained and speculative argument. It argues that Digital was the claimants' "agent" and that therefore the lien could only have been discharged by Digital's payment of the subfreights to ENS prior to the May 1997 letter. It then speculates that Digital must not have paid the money to ENS by that time, because it subsequently attempted to negotiate directly with Prozina for the shipment of the cars to Haiti.[4] Hence, its letter to Poles, Tublin perfected the lien on the subfreights before any good faith payments had been made.

This argument is seriously flawed. Leaving aside the important questions of whether

3. In the letter, Poles, Tublin was following up on its earlier settlement offers, as well as reiterating its demand that Prozina issue bills of lading. It also countered Prozina's threat to have the cars offloaded and sold with a threat to proceed with a maritime arrest of the ship.

4. Incidentally, Poles, Tublin had already stated to Prozina on May 23, 1997, that "as freight for the cargo already loaded has already been paid by the Cargo owners/Shippers to Elizabeth Newark Shipping, Inc., Vessel Owners may not lien the cargo."

the claimants' good faith should be evaluated at the time they paid Digital in April, 1997,[5] rather than the time Digital paid ENS, whether Digital, a company they paid to ship their property, was their continuing "agent" under principles of agency law, and whether the claimants were, in fact, represented by Poles, Tublin, the central fact of Prozina's argument is mere conjecture. Prozina offers no evidence that Digital had not paid ENS in full before May 29, 1997. It attempts to meet its burden of proving the existence of the lien by speculating that Digital would not have entered into negotiations directly with Prozina if it had already paid ENS. It offers no evidence to support this claim. Metellus, on the other hand, offers an affidavit from Martin Pierre, who according to the affidavit "does business as" Digital Shipping. Pierre states that on or about April 16, 1997, he had paid ENS "charter hire for the vessel, the agents, stevedores, port charges, and other related vessel expenditures in both Fall River and Haiti." In response to this evidence, the plaintiff at oral argument offered the unsubstantiated and somewhat offensive response that this Court should not credit this sworn affidavit because Pierre has received death threats "in the Haitian community" because of this affair.

Thus, Prozina has offered neither legal nor factual support sufficient to meet its burden of showing why the arrest of the thirty-four vehicles should not be vacated. Metellus' motion to vacate the arrest of his vehicle is therefore **ALLOWED**.

### IV. *MOTION FOR COUNTER–SECURITY*

▆▆▆ Metellus also seeks counter-security from the plaintiffs for his counter-claims: violations of the Harter Act, 46 U.S.C. § 193, which provides for a penalty of $2,000 for refusal to issue bills of lading; damages for conversion of his property; and violations of M.G.L. Ch. 93A. Supplemental Rule E(7) gives this Court the discretion to require the plaintiffs to post security:

> Whenever there is asserted a counterclaim arising out of the same transaction or oc-

currence with respect to which the action was originally filed, and the defendant or claimant in the original action has given security.... Fed.R.Civ.P. Supp.R. E(7).

The purpose of this rule is to put the parties on an equal footing with respect to security. *See, e.g., Result Shipping Co., Ltd. v. Ferruzzi Trading USA Inc.*, 56 F.3d 394, 399 (2d Cir.1995). Because the arrest of the vehicles is vacated, counter-security is not necessary to put the parties on an equal footing, and the motion for counter-security is **DENIED**.

### V. *THE PARTIES' DISCOVERY MOTIONS*

#### A. *Claimant Metellus' Motion for Expedited Discovery*

Metellus seeks expedited discovery based on the considerable financial hardship he has suffered on account of the loss of the expected $2,500 in profits from the expected resale of his car in Haiti. He alleges he needs the money due to the impending (now, perhaps, recent) birth of a child. Prozina does not oppose this motion with regard to automatic disclosure and exchange of documents. It offers, in fact, to exchange its entire file with the claimants on one day's notice. Prozina only opposes the motion in part, through its cross-motion for a protective order barring all depositions in this case. Because, for reasons discussed below, Prozina's cross-motion is without merit, Metellus' motion for expedited discovery is **ALLOWED**.

#### B. *Prozina's Motion for a Protective Order*

▆▆▆ Prozina seeks to have the discovery requested by Metellus limited to documentary evidence. As grounds for this request, Prozina makes four arguments: first, that the discovery Metellus seeks is irrelevant; second, that Metellus has failed to identify what facts could be discovered by oral depositions that would not be revealed by documentary evidence; third, that Prozina is incorporated in Cyprus and located in Hong Kong and has relied throughout the dispute

---

5. As evidence that he paid Digital in full in April, 1997, Metellus offered affidavits from himself and Digital, as well as copies of a receipt on Digital letterhead.

on a local agent, Lamorte Burns;[6] and fourth, that this Court should assist Prozina in reducing the cost of discovery in this case because of the cost it has already incurred for storing the cars. It cites absolutely no case law in support of these arguments.

 A party seeking a protective order must demonstrate particular and specific facts to establish "good cause" for the order. *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 7 (1st Cir.1986). Prohibiting the taking of depositions is an extraordinary measure. The moving party has a heavy burden of showing "extraordinary circumstances" based on "specific facts" that would justify such an order. *See, e.g., Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir.1979); *Investment Properties Int'l, Ltd. v. IOS, Ltd.*, 459 F.2d 705, 708 (2d Cir.1972); *Bucher v. Richardson Hospital Authority*, 160 F.R.D. 88, 92 (N.D.Tex.1994) (protective orders prohibiting depositions are "rarely granted," and then only if movant shows a "particular and compelling need" for such an order); *Motsinger v. Flynt*, 119 F.R.D. 373, 378 (M.D.N.C.1988) ("Absent a strong showing of good cause and extraordinary circumstances, a court should not prohibit altogether the taking of a deposition."); *Medlin v. Andrew*, 113 F.R.D. 650, 653 (M.D.N.C.1987); *Arthur Treacher's Franchisee Litigation*, 92 F.R.D. 429, 437 (E.D.Pa.1981); *Wright v. Patrolmen's Benev. Ass'n*, 72 F.R.D. 161, 164 (S.D.N.Y.1976) (protective order barring deposition will not be granted on the grounds that information might be available from other sources).[7]

Prozina barely even attempts to meet its burden. The only fact it offers in support of its motion to exclude depositions is Prozina's incorporation in Cyprus and location in Hong Kong. It is unclear whether this fact is offered to show that depositions of Prozina's officers would be irrelevant, or that they would be unduly burdensome. In either case, the argument is conclusory. *See Fri-deres v. Schlitz*, 150 F.R.D. 153, 156 (S.D.Iowa.1993) (conclusory statements insufficient to support a motion for a protective order). Indeed, the motion to prohibit all oral depositions would presumably extend to Prozina's acknowledged agents who are in the United States. The motion is thus far broader than even this conclusory claim of hardship and/or irrelevance would support.

Finally, and most importantly, Prozina has brought suit in both this Court and in New York, and the charter party contract with ENS provided for New York as the forum for arbitration. Having chosen to bring actions in United States fora, Prozina cannot now argue that it would be too burdensome for it to appear for discovery here. *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway and Sons*, 54 F.R.D. 280, 281 (S.D.N.Y.1971) (witness for plaintiff German corporation ordered to appear for deposition in New York); *Seuthe v. Renwal Products, Inc.*, 38 F.R.D. 323, 324 (S.D.N.Y.1965) (German plaintiff required to appear for deposition in forum he had chosen); *Slade v. Transatlantic Financing Corporation*, 21 F.R.D. 146, 146 (S.D.N.Y.1957) ("in the absence of a showing of unreasonable hardship ... [or] special circumstances," English plaintiff required to appear in forum he had chosen); *Societe Internationale Ppour Participants Industrielles et commerciales S.A. v. Clark*, 8 F.R.D. 565, 566 (D.D.C.1948); Wright & Miller, *Federal Practice & Procedure* § 2112 (1994).

 The final "economic efficiency" argument is equally without merit. Simply because the seizure of the cars has been expensive does not mean that Prozina should be entitled to the aid of this Court in limiting further costs of the litigation in which the rightfulness of that seizure will be determined. Seizing the cars was one cost of this dispute. The proper forum for addressing the expense of that seizure is in litigation of

---

**6.** Prozina does not elaborate on the significance of this fact. It might be inferred that they are suggesting that only his deposition should be taken, as he is the only Prozina agent with any knowledge relevant to this dispute. However, this interpretation would be inconsistent with Prozina's motion to bar *all* depositions at this time.

**7.** The Federal Rules simply do not support Prozina's claim that the party seeking to take a deposition has the burden of showing why it is necessary to do so. The burden is exactly the reverse. *See* Fed.R.Civ.P. 26(c), 30.

the merits of this case, where Prozina is seeking to be reimbursed. Limiting discovery because one side has already incurred damages is a bizarre principle; it would suggest that the greater the losses involved in a case, the less discovery should be allowed. It is a particularly bizarre principle when advanced by the plaintiff.

Given the cavalier nature of the plaintiff's motion, filed without regard to Local Rule 37.1, and without any serious attempt to offer particular facts in its support, I invite the claimants to file a Rule 37(a)(4) motion for their expenses and attorneys fees incurred in opposing the motion for a protective order. Fed.R.Civ.P. 26(c).

## VI. *ORDER*

Upon review of the parties' motions and the memoranda and evidence filed therewith, the motions of claimants Metellus and Jean to file late claims and answers (docket # 13, # 38) are **ALLOWED.** Metellus' motion to vacate the arrest of his vehicle and for counter-security (docket # 16) is **ALLOWED IN PART** and **DENIED IN PART.** The arrest of the two claimants, vehicles is vacated, but the motion for counter-security is denied. Metellus' motion for expedited discovery (docket # 27) is **ALLOWED.** The expedited discovery schedule Metellus sought in that motion is amended in line with today's date. All document discovery is to be completed by February 15, 1998, and all depositions to be completed by March 15, 1998. Plaintiff's motion for a protective order (docket # 41) is **DENIED.**

**SO ORDERED.**

